THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. FRED REED, Defendant-Appellant.

First District (5th Division)    No. 1—92—2465

Opinion filed April 22, 1994.—Rehearing denied May 19, 1994.—Modified opinion filed May 20, 1994.

474

MURRAY, P.J., specially concurring.

Rita A. Fry, Public Defender, of Chicago (Julie M. Campbell, Assistant Public Defender, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Veronica X. Calderon, and Michael Cho, Assistant State's Attorneys, of counsel), for the People.

JUSTICE McNULTY delivered the opinion of the court:

Defendant Fred Reed was indicted for the offenses of murder and armed robbery. After a jury trial by the circuit court of Cook County, defendant was convicted of the offenses and sentenced to 45 to 90 years' imprisonment. A timely notice of appeal was filed.

In this appeal defendant makes four arguments: (1) the evidence was insufficient to sustain a conviction; (2) defendant's inculpatory statement was improperly obtained in violation of his fifth amendment right to be free from self-incrimination; (3) the trial court denied the defendant the right to a trial by a fair and impartial jury when it allowed improper prosecutorial comments; and (4) the trial court imposed an excessive sentence.

Defendant was initially convicted of two counts of murder and one count of armed robbery and sentenced to 50 to 100 years for the murders and a concurrent 20 to 30 years for armed robbery. His

conviction was affirmed on appeal. (*People v. Reed* (1982), 104 Ill. App. 3d 331, 432 N.E.2d 979.) The Federal District Court for the Northern District of Illinois granted defendant's writ of *habeas corpus* as it found that defendant should have been allowed to raise the defense of compulsion and have the jury instructed on that issue. (*People ex rel. Reed v. Lane* (N.D. Ill. 1983), 571 F. Supp. 530.) The United States Court of Appeals affirmed the district court's issuance of defendant's petition for writ of *habeas corpus*, ordered a retrial for defendant's murder conviction only, and stayed the retrial until defendant completed serving his armed robbery sentence. *United States ex rel. Reed v. Lane* (7th Cir. 1985), 759 F.2d 618.

After defendant served the armed robbery sentence, he was retried on the two murder charges. Detective Richard Zuley testified at trial that on September 1, 1977, he and Detectives Adorjan and O'Connor responded to a call that a body was discovered in an apartment building located at 4541 North Malden Street in Chicago, Illinois. Detective Zuley testified that upon arriving at the scene and entering the apartment, he observed a white female, later identified as Beverly Truitt, lying on a bed in an advanced state of decomposition with a pillow over her head. According to Detective Zuley, the pillow contained apparent bullet holes, the victim was partially clad and was positioned with her left arm under her left side and her right arm raised in a defensive gesture. Detective Zuley stated that no jewelry was recovered either on the victim herself or in the apartment. He testified that shell casings from an automatic weapon were discovered on the mattress next to the body and on the floor near the hallway.

Detective Zuley entered the adjacent apartment and discovered the victim's boyfriend, later identified as Michael Robbins, in an advanced state of decomposition lying on his bed face down with his hands bound behind his back with a white belt and his legs bound with a reddish-brown belt. Detective Zuley testified that a pink shirt was wrapped around Robbins' neck and partially in his mouth, and a pillow containing two apparent bullet holes covered Robbins' back and neck. Upon canvassing Robbins' apartment, Detective Zuley discovered a bullet within the stuffing of the mattress which Robbins was lying on.

Officer Thomas Grinnelly testified at trial that he is a crime lab technician with the Chicago police department. Officer Grinnelly testified that on September 1, 1977, he was summoned to 4541 North Malden. Officer Grinnelly discovered Beverly Truitt on a bed in a state of decomposition. Officer Grinnelly testified that he recovered two spent cartridge casings from Truitt's apartment: the first casing

was discovered on the bed with the victim; the second casing was discovered on the floor near the bedroom door. Officer Grinnelly later determined that the bullets from these casings were fired from a .32-caliber automatic weapon. Officer Grinnelly also recovered fingerprints on an RC Cola can in Truitt's apartment and later determined that the fingerprints were those of Michael Robbins.

Officer Grinnelly then found Robbins' body in the adjacent apartment and conducted the same search for physical evidence as he did in Truitt's apartment. Officer Grinnelly testified that he discovered one spent shell casing on the bed with Robbins and a second beneath Robbins' bed. Officer Grinnelly determined that these two casings were also discharged from a .32-caliber automatic weapon. Officer Grinnelly also recovered a bullet from the mattress which Robbins was lying on.

Officer Ernest Warner testified that he is a firearms examiner for the Chicago police department crime lab. Officer Warner was qualified in court as an expert in the field of fired evidence. Officer Warner testified that on September 2, 1977, he examined fired evidence concerning the homicides of Beverly Truitt and Michael Robbins. Officer Warner examined a total of four bullets and four discharged casings. Specifically, Officer Warner examined two fired bullets recovered from Truitt's body, one fired bullet recovered from Robbins' body, and one fired bullet recovered from the crime scene. Officer Warner testified that in his expert opinion, all four spent casings were discharged from a .32-caliber automatic weapon, and the four bullets were all fired from the same barrel. Detective Theodore O'Connor testified that on September 2, 1977, he was assigned to follow up the homicide investigation of Beverly Truitt and Michael Robbins. Pursuant to this investigation, Detective O'Connor proceeded to 4539 North Malden at approximately 4 p.m. to speak with defendant, who was also known by his nickname, "Rico." Detective O'Connor testified that upon arriving at this location, he spoke with defendant's girl friend, Marie Antoinette Brown. When defendant arrived at this location, Detective O'Connor informed defendant that he was investigating the murders of Truitt and Robbins, and asked defendant to accompany him to Area 6 homicide for questioning. Detective O'Connor testified that, at Area 6 homicide, he placed defendant in an interviewing room and advised defendant of his *Miranda* rights. Detective O'Connor then testified that defendant acknowledged his understanding of his rights and proceeded to have a conversation with Detective O'Connor.

According to O'Connor's testimony defendant told Detective O'Connor that he knew Robbins as a drug dealer from the same

building in which defendant lived. Defendant also told Detective O'Connor that on Saturday, August 27, 1977, Robbins had a confrontation with "T's and blues" dealers on the corner of Wilson and Malden. According to defendant, T's and blues are a combination of drugs which produce a "high" similar to heroin when combined. Detective O'Connor's testimony was that defendant stated that Robbins was selling heroin in the area and wanted the sale of T's and blues to stop. Defendant next told Detective O'Connor that during the evening of August 27, 1977, the members of the T's and blues organization (organization) confronted Robbins in front of Robbins' apartment and accompanied Robbins inside the apartment. According to defendant's statement to Detective O'Connor, this was the last time defendant saw Robbins alive.

After his initial conversation with defendant, Detective O'Connor interviewed defendant's girl friend, Marie Antoinette Brown. Detective O'Connor testified that after this conversation with Brown, he again interviewed defendant. During this second interview, Detective O'Connor told defendant that Brown had contradicted defendant's story by asserting that Brown and defendant had seen Robbins alive on Sunday morning, August 28, 1977, as well as the previous Saturday night. At this time, defendant acknowledged that he in fact did see Robbins alive on August 28, when an intense argument erupted between defendant and members of the organization. Defendant stated that he was present at this argument, as was Lonnie Young, also known as Lonnie Hall, and Elbert Parker, alias "Big 50." Regarding this second confrontation, defendant also told Detective O'Connor that Robbins had been summoned to the meeting by Big 50, Lonnie Young, and other members of the organization. At this meeting, Robbins threatened to go to the police if the organization did not stop selling T's and blues. According to Detective O'Connor's testimony, defendant stated that after Robbins had left the meeting, Lonnie Young told Big 50 that he would eliminate Robbins.

Detective O'Connor also testified that defendant told him he had given Robbins a .32-caliber automatic pistol on Friday night, August 26.

During the course of his conversations with defendant, Detective O'Connor noticed certain items of jewelry that defendant was wearing. Specifically, Detective O'Connor testified that when he asked about the two rings on defendant's fingers, defendant maintained that he bought them in a jewelry store, although he couldn't remember the location of the store or how much he paid for them. Subsequently, defendant admitted that he did not buy them from a jewelry store but instead from a man on the street. Detective O'Con-

nor testified that defendant could not name the man who sold him the rings or relate the price which he paid for the jewelry. Detective O'Connor also asked defendant about a bracelet defendant was wearing. After first contending that he bought it in a pawn shop, defendant later stated that he found the bracelet in a garbage can.

Detective O'Connor subsequently asked defendant if he was in possession of a necklace that had been described to the police by Beverly Truitt's sister, Denise Jahn. After defendant gave Detective O'Connor permission to search defendant's apartment, Detectives Epplen and Stachula proceeded to defendant's apartment and returned with a blue stone necklace. At this time, defendant told Detective O'Connor that he forgot he was in possession of the necklace, and, regardless, it was given to him by a woman named "Maria." Detective O'Connor testified that he told defendant that he "didn't believe any of the stories about the jewelry, and that he [defendant] better for his own good tell me [Detective O'Connor] what had happened." Detective O'Connor testified that defendant stated that "things were moving too fast for him and that he wanted some time to think things over." Detective O'Connor then separated defendant and Brown and placed them in the 19th district lockup. According to Detective O'Connor, no further conversations were had with defendant after defendant was placed in lockup. On cross-examination Detective O'Connor testified that defendant did not ask to talk to him the next day. Detective O'Connor also testified that he did not converse with defendant the next day.

Detective Edward Adorjan testified that on September 1, 1977, he was assigned to the homicide investigation of Beverly Truitt and Michael Robbins. Detective Adorjan questioned defendant. Prior to questioning defendant, he advised defendant of his constitutional rights and defendant acknowledged his understanding of these rights. Adorjan testified that he told defendant about his prior conversation with Marie Brown. Specifically, Brown told Detective Adorjan that defendant came home August 30, 1977, at approximately 2:30 a.m. Brown also told the detective that she either believed or knew that the necklace recovered from defendant's apartment belonged to Truitt, and she had told defendant this. Brown next told Detective Adorjan that Robbins had borrowed defendant's .32-caliber pistol on either Friday, August 26, or Saturday, August 27.

After defendant was told by Detective Adorjan the substance of Brown's interview with the detective, defendant acknowledged his presence during the murders. Defendant told Detective Adorjan that at approximately 10:30 p.m. on Sunday, August 28, an individual whom defendant knew only as "Lonnie," later identified as Lonnie

Young, arrived at defendant's apartment and defendant agreed to accompany him to Robbins' house. Adorjan testified that defendant stated that the purpose behind their visit was to retrieve defendant's .32-caliber pistol which defendant had previously loaned to Robbins. Adorjan testified that according to defendant, when he and Lonnie arrived at Robbins' apartment, they pushed their way in. Defendant told Adorjan that Lonnie told defendant to bind Robbins with a belt. Defendant bound Robbins' legs and wrists with a belt and put a shirt around Robbins' neck. Defendant stated that after Robbins was placed on the bed, Lonnie picked up a pillow and fired two shots through the pillow into Robbins' head.

Defendant told Detective Adorjan that subsequent to this killing, Robbins' girl friend, Beverly Truitt, who lived in the neighboring apartment to Robbins, emerged from her apartment by sticking her head out the door. According to defendant, she was then pushed back into the room and shot in the head and neck by Lonnie. Defendant stated that as Lonnie was leaving the room, defendant noticed that Lonnie was carrying jewelry in his hand and had a bulge in his pocket. Detective Adorjan testified that defendant told him that he told Lonnie that he wanted something. Lonnie gave defendant a necklace, two rings, and a silver bracelet. Detective Adorjan testified that defendant subsequently agreed to give and sign a court-reported statement in the presence of an assistant State's Attorney.

During cross-examination Adorjan testified that according to defendant he had to go with Young or "he would get it himself." It was also on cross-examination that Adorjan testified that defendant told him that Young was armed with a .38-caliber pistol when he came to defendant's apartment.

Assistant State's Attorney Michael Laird testified that on September 3, 1977, he was present at Area 6 homicide for defendant's oral statement regarding the homicides of Truitt and Robbins. In accordance with defendant's statement, which Laird published to the jury, defendant stated that on August 18, 1977, at approximately 10:30 p.m., Lonnie Young came to defendant's apartment and told defendant he would "come up dead" if he didn't accompany Young to Robbins' apartment located at 4541 North Malden. Defendant's own testimony revealed that he knew Young was going to shoot Robbins when they left defendant's apartment because Young threatened to kill defendant if defendant did not knock on Robbins' door and get Young inside the apartment. Defendant testified that Young said, "If you don't go over there, you would come up dead." Defendant stated that when he and Young arrived at Robbins' apartment, Robbins, it seemed, had been lying on his bed prior to answering the door.

According to defendant, Young was carrying a .38-caliber pistol and, upon entering the apartment, retrieved defendant's .32-caliber pistol from a chair in Robbins' room. Defendant told Assistant State's Attorney Laird that he had lent Robbins the gun because Robbins feared something was going to happen to him. According to defendant, this fear arose from a drug dispute Robbins had with members of the organization.

Defendant stated that pursuant to Young's instruction, defendant tied up Robbins' legs while Young first tied up Robbins' hands and gagged him, and then put a pillow over Robbins' head and shot Robbins twice. Defendant told Assistant State's Attorney Laird that he did not actually witness Young shoot Robbins because he turned his head away to avoid seeing the shooting. As defendant and Young were leaving Robbins' apartment, Robbins' girl friend came to her door, opened it slightly, asked defendant "Rico, what has happened? What are you doing?" Defendant testified that Young responded by pushing Truitt back into her apartment. Young told defendant to wait in the hallway. While in the hallway defendant heard Young shoot Truitt twice. Defendant's testimony corroborated the fact that when Young emerged from Truitt's apartment, defendant noticed Young carrying something in his pocket and asked Young for some jewelry which Young gave him. Defendant stated that Young told him he would "come up dead" if defendant said anything. Defendant responded by going home and he testified that he has not seen Young since the shootings. Defendant stated that he wore some of the rings that Young gave him and gave his girl friend, Marie Brown, a ring.

Bobby Taboada was declared unavailable at the time of trial, but her testimony at a prior proceeding was introduced to the jury by way of stipulation. According to this testimony, Ms. Taboada was the property manager of 4541 North Malden in Chicago, the building where Robbins' apartment was located. Taboada testified that she became acquainted with Robbins when she discovered that Robbins was collecting rent for the building even though he was not authorized to do so. When Taboada subsequently asked Robbins to move, Robbins agreed as long as Taboada would call Robbins' case worker and get his checks released. Taboada testified that she was familiar with Truitt because Truitt was a neighbor of Robbins.

Taboada also testified that she knew defendant, Elbert Parker, Jr., alias "Big 50," and Lonnie Hall, alias "Lonnie Young." Taboada stated that in August of 1977, she told Young, who was not a tenant, to stay out of the building at 4541 North Malden. Taboada testified that Robbins and defendant were friends and that she observed them together a few times. Taboada testified that on August 30, 1977, at

approximately 4 p.m., she had a conversation with Big 50 while she was in her car at 5525 North Winthrop in Chicago. During the course of this conversation, Taboada gave Big 50 one of the door locks which Taboada was carrying in her back seat. According to Taboada, Big 50 then told Taboada that she wouldn't have to worry about Robbins anymore because Robbins would be taken care of. Taboada testified that on September 1, 1977, she discovered that Robbins and Truitt were dead. Taboada also noticed that the lock on Robbins' apartment was similar to the lock which she had earlier given Big 50. Taboada stated that on August 30, 1977, at approximately 5:30 p.m., she saw Robbins accompanied by Big 50's two brothers, who were holding Robbins' arms. According to Taboada, after the two brothers turned Robbins loose, he approached Taboada and told her he was going to be killed. Taboada stated that she did not subsequently call the police, nor did she relate to the police what Big 50 had told her earlier about Robbins.

At the close of evidence, the jury found defendant guilty of the murder and armed robbery of Beverly Truitt and the murder of Michael Robbins. Subsequently, the trial judge sentenced defendant to a term of 45 to 90 years' imprisonment in the Illinois Department of Corrections.

■ Defendant first contends that the evidence was insufficient to sustain a conviction. The general rule is that a conviction will be sustained where, viewed in the light most favorable to the prosecution, the record evidence is such that a rational trier of fact could have found defendant guilty beyond a reasonable doubt. (*People v. Holmes* (1990), 141 Ill. 2d 204, 565 N.E.2d 950.) At the time of the crime, compulsion was a defense to a murder charge in Illinois. (*United States ex rel. Reed v. Lane* (7th Cir. 1985), 759 F.2d 618, 623.) Defendant claims that the State failed to disprove beyond a reasonable doubt this affirmative defense. Defendant raised the defense in accordance with section 7—11(a) of the Criminal Code of 1961 (Ill. Rev. Stat. 1977, ch. 38, par. 7—11(a)), which provides in pertinent part:

> "A person is not guilty of an offense, other than an offense punishable with death, by reason of conduct which he performs under the compulsion of threat or menace of the imminent infliction of death or great bodily harm, if he reasonably believes death or great bodily harm will be inflicted upon him if he does not perform such conduct."

According to the Federal district court, the "come up dead" testimony was sufficient on its own to raise the issue of compulsion. The State concedes, as it must, that it had the burden of disproving this defense.

The question is whether the State met its burden. The defense of compulsion is a question of fact for the jury to resolve. (*People v. Sanders* (1988), 168 Ill. App. 3d 295, 307, 522 N.E.2d 715, citing *People v. Jackson* (1981), 100 Ill. App. 3d 1064, 427 N.E.2d 994.) "The trier of fact must determine the credibility of witnesses and weigh their testimony, which it is peculiarly within the jury's province to do, and a reviewing court will not substitute its judgment unless the proof is so unreasonable, improbable, or unsatisfactory as to create a reasonable doubt of defendant's guilt." *Sanders*, 168 Ill. App. 3d at 307, citing *Jackson*, 100 Ill. App. 3d at 1067, 427 N.E.2d at 998.

The State urges that no threat of imminent danger of death or great bodily harm existed at the time defendant participated in the murders of Michael Robbins and Beverly Truitt. The State maintains that, during defendant's conversation with Detective Adorjan, defendant did not mention the threat of imminent danger of death or great bodily harm to defendant if he refused to participate in the murder of Robbins. However, the record reveals that, according to Adorjan's testimony, defendant told him that he had to go with Young or "he would get it himself." Defendant's testimony revealed that he knew Young was going to shoot Robbins when they left defendant's apartment because Young threatened to kill defendant if defendant did not knock on Robbins' door and get Young inside the apartment. Young was armed with a .38-caliber pistol when he came to defendant's apartment.

The State cites *People v. Woods* (1963), 26 Ill. 2d 582, 187 N.E.2d 692, *Sanders* (168 Ill. App. 3d 295, 522 N.E.2d 715), *People v. Colone* (1978), 56 Ill. App. 3d 1018, 372 N.E.2d 871, and *People v. Nurse* (1975), 34 Ill. App. 3d 42, 339 N.E.2d 328. The State emphasizes Reed's failure to report the murders to police and his willingness to accept some of one victim's jewelry from Young.

Defendant's effort to distinguish *Sanders*, where the reviewing court upheld the trial court's determination that the State disproved defendant's affirmative defense of compulsion beyond a reasonable doubt from the case at bar is unpersuasive. That case is distinguished by Sanders' active participation in specific acts of violence. He stabbed one victim of the armed robbery in that case and hit another with a fireplace tool. Sanders claimed that he followed the orders of his codefendant and acted out of fear for his own life. On the other hand, Sanders testified that he reported the events by telephone to the brother of one of the victims and then in person to police officers in a restaurant. In the instant case, defendant did not leave the area or seek aid from others even when free to do so. (*People v. Reed* (1982), 104 Ill. App. 3d 331, 432 N.E.2d 979.) The latter distinction

cuts in favor of finding that the evidence against compulsion left no reasonable doubt of guilt.

*Colone* is another case where the reviewing court upheld the trial court's finding that the State disproved defendant's compulsion defense beyond a reasonable doubt. In *Colone*, a gun was pointed at the defendant as he was told to ring the bell of the prospective robbery victim's home in order to find out who was there. The reviewing court placed a good deal of reliance on the defendant's failure to take advantage of readily available opportunities to safely withdraw from the criminal enterprise and warn the victims in advance and notify the police. A similar opportunity was present in the instant case. The unarmed defendant was in Young's presence until Young pushed Truitt into her apartment and shot her. This created an opportunity to leave the scene and call the police. While the opportunities to withdraw were more readily apparent in *Colone* than in the instant case, defendant's counsel's claim that defendant failed to take advantage of the opportunity to withdraw due to defendant's fear of Lonnie Young is inconsistent with his willingness to request, immediately following the shooting, that Young give him some of the victim's jewelry.

In *Nurse*, the reviewing court also deferred to the finding below on the issue of compulsion. The proposition in *Woods* that lends the most aid to the State's case is that, "Where the truth lies, in any debatable set of circumstances, is a matter peculiarly for the determination of the trier of fact, be it judge or jury, and it is not for a reviewing court to substitute its opinion therefor." (*Woods*, 26 Ill. 2d at 585.) Defendant does not cite any cases where the reviewing court reverses the trial court on the issue of compulsion. In the case at bar we cannot say that the evidence against compulsion was so unreasonable, improbable, or unsatisfactory as to leave a reasonable doubt of guilt.

■ Defendant has another theory on the question of the sufficiency of the evidence. That theory is that defendant was not proven guilty beyond a reasonable doubt of the murder of Truitt because he was merely present and did not aid or abet either before or during the commission of the murder. The familiar standard of review is the same as above. The question is whether defendant's accountability for Truitt's murder was established. (Defendant's brief all but concedes that unless this court reverses the trial court's finding on the compulsion issue then defendant is accountable for Robbins' murder.) According to defendant, defendant did not aid or abet before or during Truitt's murder. Rather, he was merely present.

Defendant's conviction of Truitt's murder collaterally estopped

defendant from arguing that he was not accountable for her death. That identical issue was decided in the prior adjudication. The prior case was terminated with a final judgment on the merits. And the party against whom the estoppel is asserted (defendant) was a party in the prior proceeding. (*In re Nau* (1992), 153 Ill. 2d 406, 607 N.E.2d 134.) The reviewing court in *Reed* concluded that defendant in the instant case was accountable for Truitt's murder. The court observed that "he was present *** [and] did not oppose or disapprove of Hall's [Young's] actions. Although he was free to do so, the defendant did not leave the area or seek aid from others [citation] and instead waited for Hall to return. Reed also lent his countenance to Hall's actions by asking for some of the jewelry taken from Truitt's apartment. He did not report the incident to the authorities." *Reed*, 104 Ill. App. 3d at 339.

■ We need not consider whether defendant's inculpatory statement was improperly obtained in violation of his fifth amendment right to be free from self-incrimination. The State notes that defendant did not raise this issue on appeal after his first trial. Nor did defendant raise this issue during his petition for writ of *habeas corpus*. Although defendant could have done so, defendant does not claim to have raised this allegation of error at trial or in a post-trial motion. The general rule is that the failure to raise an allegation of error at trial and in a post-trial motion constitutes waiver of the alleged error. (*People v. Enoch* (1988), 122 Ill. 2d 176, 186, 522 N.E.2d 1124, 1130.) In the case at bar, the alleged error is waived.

■ We now consider whether the trial court allowed improper prosecutorial comments which denied defendant the right to a trial by a fair and impartial jury. Defendant's theory is that the prosecutors deliberately misstated the evidence and the law. None of the comments which defendant characterizes as improper were objected to nor was the issue raised in the post-trial motion. Despite the wide latitude prosecutors are allowed in closing argument, defendant would have us review the prosecutor's comments under the plain error exception to the waiver doctrine. Our review of the record indicates the prosecutors argued fair and reasonable inferences from the evidence.

■ Defendant was sentenced to 45 to 90 years. In 1977, the maximum term for murder was "any term in excess of 14 years." (Ill. Rev. Stat. 1977, ch. 38, par. 1005—8—1.) We cannot say that the sentence imposed is grossly disproportionate to the nature of the offense and we decline to disturb it upon review. *People v. Moore* (1988), 178 Ill. App. 3d 531, 533 N.E.2d 463.

For the foregoing reasons, the judgment of the circuit court is affirmed.

Affirmed.

COUSINS, J., concurs.

PRESIDING JUSTICE MURRAY, specially concurring:

I totally agree with the majority. Yet, I believe it should be pointed out that Reed's sentence of 45 to 90 years is not as harsh as it may seem.

Reed's original sentence of concurrent terms of 50 to 100 years for the two 1977 murders of Truitt and Robbins, and 20 to 30 years for the armed robbery, was not questioned in his prior Federal and State appeals. The 45- to 90-year sentence in this case is not as harsh as the sentences in his first trial. Further, Reed was given credit for 14 years, 9 months and 14 days for the time he served in the prior convictions.

His able public defender in this case advises the court that Reed's next parole hearing is set for August 1994. By that time the ink will barely dry on this opinion, affirming Reed's conviction and sentence. All is not gold that glitters and sentences are never as long as a judge says they should be.