THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ROLANDO SERRANO, Defendant-Appellant.

First District (5th Division)   No. 1—95—1385

Opinion filed February 7, 1997.

486

Rita A. Fry, Public Defender, of Chicago (Murray M. Coffey, Assistant Public Defender, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee G. Goldfarb, James E. Fitzgerald, and Kay Hanlon, Assistant State's Attorneys, of counsel), for the People.

JUSTICE SOUTH delivered the opinion of the court:

Following a jury trial, defendant, Rolando Serrano, was convicted of first-degree murder and three counts of armed robbery and sentenced to concurrent prison terms of 35 years for first-degree murder and 20 years for each armed robbery. He now appeals, contending that there was no probable cause for his arrest, the failure of counsel to offer an instruction on his theory of defense denied him his right to effective assistance of counsel, and his murder sentence is excessive.

At the hearing on the motion to suppress evidence, Detective John Santo Padre testified that on December 10, 1990, he was investigating the homicide and armed robbery of James Lyons, who was fatally shot in the head at a tavern at 4164 West Grand Avenue in Chicago. On that day or the next, Santo Padre received a telephone call from a man named Herich, who identified himself as a supervisor at Kedvale Park, which was near the crime scene. He told Santo Padre that he had heard some of the youths who frequent the park say that "Fee-Fee" was bragging about killing the man at the tavern on Grand Avenue. Herich said he knew Fee-Fee from park activities and that he lived somewhere on Kedvale Avenue and went to Orr High School.

Santo Padre asked Herich to look through his records and see if he could find Fee-Fee's name and address. A day or two later, Herich told Santo Padre that "Fee-Fee" was defendant Rolando Serrano,

who he described as a 14- or 15-year-old white Hispanic, about 5 feet 5 inches or 5 feet 6 inches tall, 120 to 130 pounds, with black hair who lived near the park somewhere on Kamerling Avenue. This matched the descriptions given by witnesses to the shooting. Santo Padre then advised his supervisor of this information.

Detective Bernard Brennan testified that on December 13, 1990, he was assigned to participate in the investigation of the homicide of James Lyons. On that date, he and Officers Fleming and Kummings learned that defendant was a student at Schurz High School and that he lived at 4111 West Kamerling. The officers then went to Schurz and, upon viewing defendant, determined that he fit the physical description of one of the offenders because he was similar in height, weight, hair and age with a slight mustache. Brennan also was aware of the information provided by Herich. Defendant was arrested, advised of his *Miranda* rights and taken to the police station.

Brennan testified that the area around Kamerling and Pulaski has a high density population of Hispanics. The court found that it was not imprudent for the officers to believe that they had probable cause to arrest defendant and denied the motion. Thereafter, a motion to suppress statements was heard and denied by the court.

Patricia Job testified at trial that she was a bartender at Mitch's Place at 4164 West Grand Avenue. On November 1, 1990, she was there with her husband and several regular patrons. About 5 p.m., defendant entered and requested a six-pack of beer, but Job did not give it to him because he could not produce a valid proof of age. He then left. A short time later a tall black man entered and also requested liquor but left when he could not produce a valid proof of age.

Several minutes later the black man returned and ordered "everybody down on the floor." Defendant and another black man then came through the back door. The man with defendant went to Job and put a gun to her head. As Job got to the floor, she saw the victim get off his stool and go toward the other black man at the door. She then heard a shot. The man that had put the gun to her head took the money from the cash register, and the three offenders left. On December 13, 1990, Job tentatively identified defendant, and six days later she positively identified him. The man who came in the back door with defendant and the other man by the front door both had guns; defendant did not.

Carlos Rivera was a tavern patron when the incident occurred. He and his brother Miguel were sitting near the back door. He saw defendant enter and try to buy beer and then leave, and he also saw his accomplice do the same. Shortly thereafter, the second man to try

and buy beer, a tall black man, came in the front door holding a gun and announced a robbery. At the same time, another black man and defendant came in the back door. Rivera got on the floor and defendant searched his pockets, taking his wallet. Rivera then heard a gunshot.

Miguel Rivera reiterated his brother's testimony. He said that defendant also searched his pockets and took his wallet. Defendant also asked Miguel if he had any gold, and Miguel looked directly into his face. Miguel heard a shot and the men ran out. On December 13, 1990, Miguel made a positive identification of defendant.

Mitchell Job was also there that day and corroborated the others' testimony. According to Job, defendant was the only one of the three men without a gun. The man who came in the back door with defendant did not have the gun pointed at defendant. Neither gunman gave defendant any directions.

Detectives Bernard Brennan and Joseph Mohan testified that, after they arrested defendant, defendant spoke with his mother, was advised of his *Miranda* rights, and agreed to give a statement. Defendant stated that on November 1, 1990, he was with "Main" and "T," looking for a place in the neighborhood to rob. Defendant stated that the two other men had guns, and they eventually decided to rob Mitch's Place. Defendant first went inside to see how many people were there and then "Main" did the same. "Main" came out and told "T" and defendant to take the back door, and he would enter the front door. When the patrons got down on the floor, defendant went through their pockets. As he did so, he heard a gunshot from where "Main" was standing, and the men grabbed the money from the cash register and ran. The men then went to a vacant lot and split the money. Defendant's portion was $45.

A lineup was conducted and two of the witnesses made a tentative identification of defendant and two made a positive identification of defendant. Defendant thereafter gave a court-reported statement to an assistant State's Attorney which was the same in substance as the statement he gave to Mohan and which was read to the jury.

Mercedes Esparza, defendant's supervisor at work, testified that defendant had a reputation in the community for honesty and veracity.

Defendant testified that, in November 1990, he was 15 years old. Calvin McLemore or "Main" lived next door to him. After his arrest, he gave the police McLemore's full name. He also knew "Tim" or "T" from around the neighborhood. On November 1, 1990, he saw "T," who asked him to participate in a robbery, but defendant declined. Later on the same day, "T" and "Main" again approached

him with guns and said defendant was going to help them. Defendant testified he never told the police that he, "Main" and "T" were looking for a place to rob; rather, the police told him that was what they were doing.

Defendant testified that he went into the bar because he was afraid of "T" and McLemore, who were armed. "T" forced defendant to go into the back door of the bar at gunpoint. Defendant initially went into the bar to see who was inside, but he was too frightened to tell the others, so McLemore entered. Once they got into the tavern, "T" kept the gun on defendant and told him to search whoever was on the floor.

Defendant never admitted that he told the police that he was forced to go in because he was afraid the others would find out. Several days after this crime, "T" told defendant that if he told anyone what happened "T" would do something to defendant or his family.

Calvin McLemore, who was in custody for this crime at the time of trial, testified that, when the three discussed this robbery, defendant did not want to participate. McLemore and "T" threatened defendant and his family with the guns and made him go into the tavern to check it out. When defendant came out of the tavern, he did not say anything so McLemore entered. When he came out, "T" started telling defendant what he was going to do and defendant protested. "T" then led defendant to the back door at gunpoint. At the time he was arrested, McLemore did not tell the police that he and "T" forced defendant to participate. "T" was never apprehended.

During deliberations, the jury sent a note to the court asking: "Is Rolando legally responsible for these crimes if he was forced into these actions?" After much discussion with counsel, the court said it would reply. But before the court answered, the jury returned a guilty verdict.

■ Defendant first contends that the officers in this case did not have probable cause to effectuate his arrest. A reviewing court will not disturb a trial court's finding on a motion to quash and suppress unless that finding is determined to be clearly erroneous. *People v. Foskey*, 136 Ill. 2d 66, 76, 554 N.E.2d 192, 197 (1990). Our task on review is simply to ensure that the trial court had a substantial basis for concluding that probable cause existed. *People v. Williams*, 147 Ill. 2d 173, 209, 588 N.E.2d 983, 995 (1991). Probable cause may be founded upon evidence that would not be admissible at trial, and even hearsay is a proper consideration when determining probable cause. *People v. Johnson*, 187 Ill. App. 3d 756, 771, 544 N.E.2d 392, 401 (1989).

■ Probable cause to arrest exists when a reasonable and prudent

person, having the knowledge possessed by the officer at the time of the arrest, would believe the defendant committed the offense. *Williams*, 147 Ill. 2d at 209, 588 N.E.2d at 995. Whether the necessary probability exists is governed not by technical legal rules but by commonsense considerations that are factual and practical. *Williams*, 147 Ill. 2d at 209, 588 N.E.2d at 995. Probable cause to arrest can be based on a tip, if the tip is found reliable. *Foskey*, 136 Ill. 2d at 76, 554 N.E.2d at 197.

■ Here, the police received a call from a park supervisor who told them that some neighborhood youths said that "Fee-Fee" was bragging about committing the instant offense. The supervisor said that "Fee-Fee" frequented the area and lived on Kamerling west of Pulaski, which was near the scene of the crime. One or two days later, the supervisor called and said "Fee-Fee" was Rolando Serrano, who lived on Kamerling. Herich also said he believed that Serrano went to Orr school and was a male white Hispanic, 14 or 15 years old, 5 feet 5 inches tall and weighing 120 to 130 pounds with black hair. These features matched the description of one of the offenders.

Based on the information given, the officers went to Orr school but learned that defendant attended Schurz school. There, they saw defendant, who matched the description given by the witnesses. Based on all the factors known to the officers, we believe the trial court was correct in concluding that they had probable cause to arrest.

Defendant next contends that his counsel was ineffective for not tendering a compulsion instruction to the jury where that was the theory of defense and where there was ample evidence to support such an instruction. Additionally, defendant contends that this was exacerbated by the fact that even when the jury sent a note to the court, which indicated it was considering defendant's evidence, counsel did not at that time request the instruction.

■ The Illinois compulsion defense statute provides: "A person is not guilty of an offense, other than an offense punishable with death, by reason of conduct which he performs under the compulsion of threat or menace of the imminent infliction of death or great bodily harm, if he reasonably believes death or great bodily harm will be inflicted upon him if he does not perform such conduct." 720 ILCS 5/7—11 (West 1994).

■ First, we must decide if compulsion can be a defense here. The State argues that compulsion is not a defense to murder. However, compulsion is a defense to armed robbery and defendant cannot be guilty of felony murder if he was compelled to commit the underlying felony. We have found only one Illinois case where the defendant has argued that the defense of compulsion should apply to the felony-

murder situation. In *People v. Driskel*, 224 Ill. App. 3d 304, 586 N.E.2d 580 (1991), the defendant argued that there was only evidence that he stabbed one of four murder victims. Therefore, the jury must have applied the theory that the murders were committed in the course of a forcible felony and that *People v. Gleckler*, 82 Ill. 2d 145, 411 N.E.2d 849 (1980), which upheld the constitutionality of the compulsion defense statute, was inapplicable because it did not address the situation where the defendant agrees to participate in a felony under compulsion (to which compulsion is a valid defense) and later someone is murdered in the course of that felony.

The *Driskel* court found that defendant's argument was based on a misinterpretation of evidence presented at trial, because the evidence showed that he committed the murder as a principal or an accomplice. Therefore, the court did not consider the question posed here, stating, "[t]his was not a situation where [defendant] was compelled to commit armed robbery and had nothing to do with the murders." *Driskel*, 224 Ill. App. 3d at 313, 586 N.E.2d at 586.

We believe that *Gleckler* does not adequately address the issue before us. The rule that compulsion is not a defense to murder evolves from the rationale that when a person is confronted with a choice between two evils, such as his own death or the death of another, the individual ought to sacrifice his own life rather than escape by the murder of an innocent. Thus, in *Kansas v. Hunter*, 241 Kan. 629, 740 P.2d 559 (1987), when faced with this question, the court held that "any limitation to the defense of duress should be confined to crimes of intentional killing and not to killings done by another during the commission of some lesser felony." *Hunter*, 241 Kan. at 641, 740 P.2d at 568. The court went on:

> "[I]f A compels B at gunpoint to drive him to the bank which A intends to rob, and during the ensuing robbery A kills a bank customer C, B is not guilty of the robbery (for he was justified by duress) and so is not guilty of felony murder of C in the commission of robbery. The law properly recognizes that one is justified in aiding a robbery if he is forced by threats to do so to save his life; he should not lose the defense because his threateners unexpectedly kill someone in the course of the robbery and thus convert a mere robbery into a murder." *Hunter*, 241 Kan. at 641-42, 740 P.2d at 568.

We believe that in the situation before us defendant, if he was com-

pelled to commit this robbery, should not be convicted of a murder that those who compelled him unexpectedly committed.[1]

■ We next must decide whether a compulsion instruction was justified in this case. Here, defendant did not dispute that he was present during this incident, but contended that he was compelled through fear to do it. Both he and his accomplice testified that he was forced to perform these acts by gunpoint, and defendant stated that he did not tell the police afterward because he was told he and his family would be harmed if he did so. It is undisputed that both men with defendant had guns but defendant did not. Compulsion is an affirmative defense that would exculpate an accused if the trier of fact believed that the elements of compulsion had been proven. *People v. Pegram*, 124 Ill. 2d 166, 172, 529 N.E.2d 506, 509 (1988). However, no instruction was presented here. Therefore, it cannot be said that the jury, not having been instructed on the defense of compulsion, knew that the defendant's testimony concerning his fears of immediate harm and being forced by the other two men to do the armed robbery could provide a defense to the acts. *Pegram*, 124 Ill. 2d at 173, 529 N.E.2d at 509. This is especially evident in this case, where the jury asked the court: "Is Rolando legally responsible for these crimes if he was forced into these actions?" We believe that where counsel set forth a compulsion defense, he should have requested an instruction on such. Where defense counsel argues a theory of defense but then fails to offer an instruction on that theory of defense, the failure cannot be called trial strategy and is evidence of ineffective assistance of counsel. *People v. Lewis*, 240 Ill. App. 3d 463, 467, 609 N.E.2d 673, 676 (1992). The defense of compulsion is a question of fact for the jury to resolve (*People v. Reed*, 262 Ill. App. 3d 473, 482, 634 N.E.2d 291, 297 (1994)), and defendant need only present some evidence of compulsion in order to raise the defense. *People v. Scherzer*, 179 Ill. App. 3d 624, 645, 534 N.E.2d 1043, 1058 (1989). We believe this was an appropriate case for the instruction.

We also cannot say that any error in not giving the compulsion instruction was harmless beyond a reasonable doubt. Although defendant gave a court-reported statement admitting guilt, he gave an explanation of why he did so at trial, that his life and the lives of his family had been threatened. Additionally, while we could say that the State's evidence was sufficient beyond a reasonable doubt, that determination was for the jury. In order to make that determination, the jury was entitled to accurate instructions. Defendant's account of

---

[1]We note that defendant here was not eligible for the death penalty because of his age. 720 ILCS 5/9—1(b)(6) (West 1994).

the incident along with his co-offender's account, and the testimony that defendant did not have a weapon, could have persuaded properly instructed jurors to conclude defendant was compelled to do this crime. See *People v. Salazar*, 162 Ill. 2d 513, 525-26, 643 N.E.2d 698, 705 (1994). The compulsion instruction should have been given to the jury and the failure to do so deprived the defendant of a fair trial.

For the foregoing reasons, we believe that the instant conviction and sentence should be reversed and the matter remanded for a new trial.

Reversed and remanded.

HOFFMAN and HOURIHANE, JJ., concur.