THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ROMELLE WETZEL, Defendant-Appellant.

First District (3rd Division)    No. 1—98—2380

Opinion filed November 10, 1999.

Michael J. Pelletier and Tiffany Boye, both of State Appellate Defender's Office, of Chicago, for appellant.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb, Linda Woloshin and Holly L. Rappin, Assistant State's Attorneys, of counsel), for the People.

JUSTICE WOLFSON delivered the opinion of the court:

Throughout this first degree murder trial the prosecution contended Romelle Wetzel, the defendant, or Dorian Jefferson, the defendant's companion, fired the fatal shot at Leonard Brown. The defendant claimed he was firing his .380 semi-automatic pistol at a wall, not at Brown or anyone else. Some members of the jury had yet another theory and, after deliberations began, three times asked the trial judge about it. After the third time, the judge answered the jury's question with a single, underlined word. We conclude the jury was incorrectly reinstructed. We reverse the defendant's first degree murder conviction and remand this cause for a new trial.

## FACTS

At about 11 p.m. on May 6, 1996, Chicago police officer Sandra

Otero and her partner, Officer Ronald Heard, were riding in an unmarked police car headed westbound on 75th Street when they heard about eight gunshots in rapid succession. They proceeded in the direction of the shots. Within a minute, the officers reached the corner of 75th and Dorchester, where they saw a black Nissan car parked 10 to 15 feet from the corner, on the east side of Dorchester Street. The car's front doors were open and two black men were standing on either side of the car. The man on the passenger side, later identified as Wetzel, was leaning over the roof of the car, firing a gun. The officers saw Wetzel fire at least three shots. Neither officer saw anyone on the street when Wetzel was shooting.

Officer Otero testified she saw Wetzel "shooting in a northwest direction." When asked by the State, "What is located in that direction?" Otero responded, "Residential houses and a vacant lot." She was impeached with her arrest and case reports, in which she said Wetzel had been firing "westward." On redirect, the State asked Otero what she told Detective Bernatek. Otero said she told Bernatek, "He was firing northwest."

Officer Heard, who had prepared the arrest report, testified Wetzel fired in a "westward" direction. He clarified his answer by saying "westward" meant "at an angle" going north.

The officers turned onto Dorchester and parked directly behind the Nissan. Wetzel stopped shooting, got in the front passenger seat, and threw his gun out the window. The man standing on the driver's side of the Nissan later was identified as Dorian Jefferson. He, too, had a gun. The officers saw Jefferson throw his gun under the Nissan when he saw the approaching police car. Jefferson then got in the driver's seat and closed the door.

Officers Otero and Heard immediately placed Jefferson and Wetzel under arrest, read them their rights, and turned them over to other officers to be transported to the police station. The guns Wetzel and Jefferson had discarded were recovered and secured as evidence.

Officer Otero testified the gun she saw Wetzel firing was a Jennings .380 semi-automatic pistol. It held one live round in the chamber and two live rounds in the magazine. The gun recovered from under the Nissan, where Jefferson had thrown it, was a 9 millimeter Jennings semi-automatic pistol. It, too, had one live round in the chamber and two live rounds in the magazine.

A minute or two after arriving on the scene, while placing Jefferson and Wetzel under arrest, Officers Otero and Heard saw an 18-year-old man, later identified as Leonard Brown, stumble out from the vacant lot located at about 7426 South Dorchester (the middle of the block) and collapse in the street at about 7434 South Dorchester

(northwest of the Nissan). Brown had a gunshot wound to his abdomen and was bleeding heavily. An ambulance was called. Brown was transported to Christ Hospital, where he later died.

Nancy Jones, an assistant Cook County medical examiner, performed an autopsy on Brown. At trial, Jones testified Brown died as a result of a through-and-through gunshot wound to his abdomen. The external examination showed that the bullet entered Brown's left upper abdomen and exited the right side of his back. The wound, she said, would not have been immediately incapacitating.

A forensic investigator for the Chicago police department, Frank DeMarco, took several photographs of the crime scene and recovered a number of spent cartridge casings. At trial, DeMarco testified about the photos, which showed the area where Brown collapsed, the vacant lot, and locations where physical evidence was recovered.

DeMarco recovered cartridge casings from three locations: six spent .380 cartridge casings were found on the parkway and street in the vicinity of 7449 South Dorchester, near where the Nissan was parked; three spent .380 cartridge casings were found across the street, on the sidewalk at 7450 South Dorchester by the hot dog stand on the northwest corner of 75th and Dorchester; and three spent .380 cartridge casings, a spent 9 millimeter cartridge casing, and a fired 9 millimeter bullet were found on the sidewalk around the corner from the hot dog stand, near some public telephones at 1358 East 75th Street. No weapons, bullets, or casings were found in the vacant lot. No bullet holes were found in the Nissan or in the brick wall of the hot dog stand. No fingerprints were detected on any of the recovered cartridge casings. There is no evidence connecting a recovered casing to Brown's fatal wound.

It was later stipulated that Ernest Warner, a Chicago police crime lab firearm expert, if called, would testify he examined the cartridge casings microscopically. Based on his examination of the casings, he found: four of the six .380 casings recovered at 7449 South Dorchester appeared to be consistent with and could have been fired by a Jennings semi-automatic pistol such as the gun recovered from Wetzel; the 9 millimeter fired bullet and cartridge casing recovered at 1358 East 75th Street appeared to be consistent with and could have been fired by a Jennings 9 millimeter semi-automatic pistol such as the gun recovered from Jefferson; the remaining six .380 discharged casings found at 7450 South Dorchester and 1358 East 75th Street did not appear to be consistent with a Jennings-type pistol and probably were not fired by the guns used by either Wetzel or Jefferson. It could not be determined whether the remaining casings were fired from more than one gun.

Forensic expert Scott Rochowicz testified he performed a gunshot residue test on Wetzel's hands, but he could not say with any degree of scientific certainty whether Wetzel had fired a gun on the night of May 6, 1996. He opined that the results of the test were inconclusive because there had been a four-hour time lag between Wetzel's arrest and the administration of the gun residue test.

Assistant State's Attorney Ursula Walowski testified she arrived at Area Two police headquarters on May 7, 1996, and spoke with Wetzel regarding the shooting death of Leonard Brown. At that time, Wetzel told her "he did not shoot anyone, that he did not have a gun, that the police were putting this on him, and that he saw this sort of thing in a movie."

The State's final witness was Detective Paul Bernatek. He testified he spoke with Officer Otero at the third district police station shortly after the incident on May 6, 1996. The following colloquy took place:

"Q. [State] Did she in fact at that time [1 a.m.] tell you that she looked northbound on Dorchester and observed a male black now known as Romelle Wetzel leaning over the hood of a black Nissan firing a gun towards a vacant lot at approximately 7426 South on Dorchester?

A. [Bernatek] Yes."

Hearsay objections were made to this testimony but were overruled.

Defendant testified. He said he and Jefferson had been riding in Jefferson's Nissan on the night of May 6, 1996, when they stopped so he could use a pay phone. As he walked toward the pay phones at the corner of 75th and Dorchester, Wetzel said, he heard six or seven gunshots. He said he did not see anyone on the street and did not know where the shots were coming from.

Wetzel said he ran back to Jefferson's car, pulled out his .380 semi-automatic gun, and fired three to four shots over the hood of the car in a westward direction. Wetzel claimed he did not aim his gun at anyone, but instead fired at the brick wall of the hot dog stand located across the street, in an attempt to "scare off" whoever was shooting.

At defense counsel's request, the jury was instructed on involuntary manslaughter in addition to murder. However, the trial court refused defense counsel's request to instruct the jury on Illinois Pattern Jury Instructions, Criminal, No. 3.11 (3d ed. 1995) (hereafter IPI Criminal 3d) in its entirety. Instead, the court instructed the jury on the first portion of the instruction only—that prior inconsistent statements may be considered for impeachment purposes only, not as substantive evidence.

After hearing argument, the jury retired to deliberate. After some time, the jury sent the judge a note, asking:

"How many bullets does a .380 mm semi-automatic gun hold?"

The judge told the jurors they had received all the evidence they were going to receive and to continue deliberating.

The jury then sent out a second note, asking:

"If we thought the defendant was aiming to kill someone besides the deceased, and the deceased was shot instead, and died, is it first degree murder, involuntary manslaughter or other?"

The judge responded by telling the jurors he could not tell them what the verdict should be, it was for them to determine.

The jury then sent out a third note, asking:

"Does the law state that a person who shoots a gun at one person with the intent to kill, and misses this person, but instead hits a second unseen person, is guilty of first degree murder, or involuntary manslaughter, or other?"

At this point, defense counsel asked the judge to instruct the jury on self-defense and second degree murder. The judge refused to give the additional instructions and responded to the jury as he had before.

The jury's fourth note to the judge said:

"Dear Judge,

1) We vote 11:1 in favor of first degree murder.

2) The single other vote would vote for involuntary manslaughter.

3) I asked the question 'Does anyone believe they might change these issues for an additional few hours' and the answer was no, that no one would likely change their mind."

Defense counsel asked for a mistrial, but the judge denied the request. The judge sent back a note telling the jury to continue to deliberate. Simultaneously, the jury sent out its fifth and final note, asking:

"If Person A shoots to kill Person B, but instead shoots and kills Person C, is Person A responsible for the death of Person C equally as if he had killed Person B?"

The judge responded this time by saying, over objection, Yes. Twenty minutes later the jury rendered its verdict finding Wetzel guilty of first degree murder.

Wetzel filed a posttrial motion for new trial, which was denied. He was sentenced to 45 years' imprisonment. This appeal followed.

OPINION

Because the defendant presents several meritorious issues, we have set out the testimony in some detail. Our first obligation is to

determine whether the evidence supports the verdict. Defendant contends it does not.

### 1. The Jury's Verdict

■ The relevant question is whether any rational trier of fact could have found all of the essential elements of the offense beyond a reasonable doubt. *People v. Young*, 128 Ill. 2d 1, 49, 538 N.E.2d 453 (1989). "When the State cannot meet its burden of proof, the defendant must go free." *People v. Smith*, 185 Ill. 2d 532, 545-46, 708 N.E.2d 365 (1999).

To say the least, taking the State's evidence in its best light, this is a close case.

Officers Otero and Heard said they heard about eight gunshots before arriving on the scene and seeing Wetzel fire his gun about four times. They said Wetzel was aiming in the general direction of the vacant lot where Brown came from a minute or two later. They did not see Wetzel aiming at anyone.

The physical evidence clearly suggests someone other than Wetzel or Jefferson had been firing a gun in the area—a total of eight shell casings that could not be traced to Wetzel's or Jefferson's gun were found, six of them across the street from the area where Wetzel and Jefferson were standing.

The medical examiner said Brown's wound would not have immediately incapacitated him. We cannot be sure where Brown was standing when he was shot. Nor can we determine the source of the bullet, since the bullet passed through Brown's body. No evidence connects a recovered shell casing to the fatal wound.

■ Despite the impeachment of Otero concerning the direction in which Wetzel was firing (at trial, "northwest," in case and arrest reports, "westward"), we conclude there is some support for the jury's apparent determination that Wetzel intentionally fired a gun in the direction of one or more persons, fatally wounding Brown. Since the jury did not have instructions concerning self-defense or second degree murder, its next logical step was a first degree murder guilty verdict. We cannot say, as a matter of law, the verdict should have been not guilty. That is, a rational jury could have found the defendant guilty beyond a reasonable doubt. *People v. Goff*, 299 Ill. App. 3d 944, 950, 702 N.E.2d 299 (1998).

### 2. The Trial Court's Answers to Jury Questions

Each side went to the jury with a specific and consistent theory.

The State contended Wetzel or Jefferson killed Brown when they fired at him as he stood in the vacant lot. For that reason, the State

did not offer the bracketed phrase "or another" in its first degree murder instructions. See 720 ILCS 5/9—1(a)(1), (a)(2) (West 1996) ("intends to kill or do great bodily harm to that individual *or another*" or "knows that such acts create a strong probability of death or great bodily harm to that individual *or another*"). (Emphasis added.)

Instead, the jury was told the State had to prove the defendant or Jefferson "intended to kill or do great bodily harm to Leonard Brown; or he knew that his acts would cause death to Leonard Brown; or he knew that his acts created a strong probability of death or great bodily harm to Leonard Brown." IPI Criminal 3d No. 7.02A.

The defense apparently gambled. It chose not to offer self-defense or second degree murder instructions. Instead, it contended since Wetzel was firing at a wall, not at people, he should be found not guilty or, at most, convicted of involuntary manslaughter.

■ The gamble was unsuccessful, but we do not agree with the defense contention on appeal that trial counsel was constitutionally ineffective because he didn't offer a self-defense instruction. That is, the defendant does not overcome the presumption that counsel's challenged action might be considered sound trial strategy. *Strickland v. Washington*, 466 U.S. 668, 689, 80 L. Ed. 2d 674, 694-95, 104 S. Ct. 2052, 2065 (1984). Had defense counsel argued self-defense to the jury, it would have been ineffective assistance to fail to offer a self-defense instruction. *People v. Serrano*, 286 Ill. App. 3d 485, 492, 676 N.E.2d 1011 (1997). But no such argument was made.

■ Still, there are reasons why we do not have confidence in the verdict reached by the jury. Things began to unravel when the jury sent questions to the trial judge. We can draw two clear inferences from the questions. First, the jury was considering a theory of transferred intent. It said so three times. Second, the jury was searching for an alternative to finding the defendant guilty of first degree murder or involuntary manslaughter.

The jury twice said it wanted to know if the killing of someone other than the person shot at is "first degree murder, or involuntary manslaughter, *or other*." (Emphasis added.) Of course, there was no "other." After the second note was read, defense counsel asked for additional instructions on self-defense and second degree murder. Each time, the jury received no further guidance.

By answering the jury's final question—"If Person A shoots to kill Person B, but instead shoots and kills Person C, is Person A responsible for the death of Person C equally as if he had killed Person B?"—with an underlined "Yes", the trial judge allowed the jury to find the defendant guilty of first degree murder on a transferred intent theory. He was, in effect, inserting the bracketed "or another" in the murder instructions.

The trial judge's answer introduced a new theory into the case. The defendant never had the opportunity to defend against it. At the same time, the court refused defendant's request to tell the jury what "other" offense might be applicable and what defense might apply to the newly defined first degree murder charge.

The trial judge was faced with a difficult and unusual situation—a jury that constructed a theory never raised during the trial and apparently not anticipated by either side.

It is clear the judge was aware of his obligation to instruct during deliberations where the jury poses an explicit question or requests clarification on a point of law that has created doubt or confusion. *People v. Cortes*, 181 Ill. 2d 249, 280, 692 N.E.2d 1129 (1998); *People v. Reid*, 136 Ill. 2d 27, 39, 554 N.E.2d 174 (1990). At the same time, failing to respond or responding in a way that fails to answer the question may be as prejudicial as a response that is inaccurate, misleading, or likely to direct a verdict one way or another. *People v. Childs*, 159 Ill. 2d 217, 229, 636 N.E.2d 534 (1994).

The duty to clarify has been held to authorize reinstruction on a new theory, even after the jury has begun deliberations. In *People v. Oden*, 261 Ill. App 3d 41, 633 N.E.2d 1385 (1994), an unlawful-weapon-possession-by-a-felon charge was presented to the jury on a theory of actual and direct possession. After arguments, the jury sent out questions indicating it was considering a constructive possession theory, but the trial judge refused to instruct on it. The court found the refusal to clarify the issue of possession was an abuse of discretion. Still, trial judges should be extremely reluctant to instruct on a new theory once deliberations have begun. See *People v. Gramc*, 271 Ill. App. 3d 282, 288-89, 647 N.E.2d 1052 (1995) ("the court should not submit new charges and new theories to the jury after the jury commences its deliberations, regardless of which party requests such").

We believe the trial judge in this case could have insisted the jury base its verdict on the instructions it already had, but we are not willing to say the giving of additional instructions was an abuse of discretion. We do hold that once the judge decides to give additional instructions, they should be complete and accurate. In this case, the answer "Yes" was incomplete and misleading.

Once the jury was allowed to consider the defendant was returning fire from others when he killed Brown, a potential self-defense scenario was created. The defendant's request for self-defense and second degree murder instructions should have been granted. The evidence supported them and the trial court's answer invited them. When the issue of self-defense is raised, as it was here, the reasonableness of the defendant's belief that use of force was necessary becomes an issue for the jury. *People v. Kauffman*, 308 Ill. App. 3d 1, 13-14 (1999).

Without those instructions, the defendant was left with no defense to the first degree murder charge and no opportunity to mitigate a first degree murder finding to second degree murder. Because the case was so close, a properly instructed jury was critical to a fair and just result. The evidence in this case is not so clear and convincing as to render the erroneous instruction harmless beyond a reasonable doubt. See *People v. Dennis*, 181 Ill. 2d 87, 109, 692 N.E.2d 325 (1998).

Since we have found the evidence was sufficient to support a first degree murder verdict, we remand the case for a new trial. The defendant raises other issues that might again occur. For that reason, we briefly address those issues.

### 3. Officer Otero's Prior Consistent Statements

■ The angle at which Wetzel was firing his semi-automatic became an important issue in the case. Directly west of him was the hot dog stand wall. To the north and west was the vacant lot Brown stumbled out of. Officer Otero testified Wetzel was aiming in a "northwest" direction. She was impeached with her arrest and case reports, where she said Wetzel was firing "westward." On redirect, over objection, Otero said later that night she told Detective Bernatek "he was firing northwest." Bernatek testified, over objection, Otero told him Wetzel was "leaning over the hood of a black Nissan firing a gun towards a vacant lot at approximately 7426 South on Dorchester."

This was error. There are occasions when prior consistent statements may be admissible to corroborate a witness's trial testimony. But this is not one of them.

The prior statement did not serve "to rebut a charge or an inference that the witness is motivated to testify falsely or that his testimony is of recent fabrication." *People v. Williams*, 147 Ill. 2d 173, 227, 588 N.E.2d 983 (1991). There was no claim or inference of motive to testify falsely or of recent fabrication during the cross-examination of Officer Otero. It was impeachment by prior inconsistent statement, pure and simple.

The mere fact that a witness's testimony has been discredited by impeachment is not sufficient reason to allow use of a prior consistent statement. *People v. Bobiek*, 271 Ill. App. 3d 239, 244, 648 N.E.2d 160 (1995). Expanding the recent fabrication exception to this kind of impeachment would swallow the rule. *People v. Bobiek*, 271 Ill. App. 3d at 244.

Nor is this a case where the consistent statement could be used to qualify or explain the inconsistency. See *People v. Harris*, 123 Ill. 2d 113, 142, 526 N.E.2d 335 (1988); *People v. Hicks*, 28 Ill. 2d 457, 463, 192 N.E.2d 891 (1963). Otero's purported statement to Bernatek had nothing to do with the arrest and case reports used to impeach her.

In addition, we note Bernatek's version of Otero's statement—"firing a gun towards a vacant lot at approximately 7426 South on Dorchester"—went well beyond Otero's claim she told the detective Wetzel was "firing northwest." That variance raises a foundation problem we need not discuss.

### 4. Otero's Prior Inconsistent Statement as Substantive Evidence

■ The defendant impeached Officer Otero with her written, signed arrest and case reports. The State made no objection to the impeachment when it happened. At the instructions conference, defense counsel, based on section 115—10.1 of the Code of Criminal Procedure of 1963 (725 ILCS 5/115—10.1 (West 1996)), asked for the second paragraph of IPI Criminal 3d No. 3.11, which would have told the jury the impeaching statements ("westward") could be considered as substantive evidence. The trial court, giving no reason, refused, limiting use of the statements to the weight to be given the witness's courtroom testimony.

This was error concerning a seriously disputed issue in the case. The impeachment fit perfectly within section 115—10.1. Here, as in *People v. Zurita*, 295 Ill. App. 3d 1072, 693 N.E.2d 887 (1998), the fact that the statements were admitted for impeachment purposes did not minimize the prejudice caused by excluding substantive use.

### 5. Closing Argument by the Prosecution

■ Wetzel contends the State's rebuttal argument introduced facts not in the record and unfairly tried to discredit physical evidence which supported his innocence.

During rebuttal, the prosecutor tried to explain away the shell casings that could not be tied to Wetzel's gun:

> "If all of us took a field trip today to the corner of 75th and Dorchester right now and we looked at the street that is near the hot dog stand by the corner, the east corner of 75th and Dorchester up and down that street, I bet we would recover a whole lot of discharged casings *** I bet you we'll find lots of .380 shell casings, a lot of nine millimeter shell casings. That has nothing to do with the case you are deciding today."

A prosecutor may not argue facts not in evidence. *People v. Burrows*, 148 Ill. 2d 196, 592 N.E.2d 997 (1992). We expect this argument will not be repeated should this case be tried again.

## CONCLUSION

For the reasons we have set out above, we reverse the defendant's

conviction for first degree murder and remand this cause to the trial court for a new trial.

Reversed and Remanded.

CAHILL, P.J., and CERDA, J., concur.