# Illinois Official Reports

## Appellate Court

---

### *People v. Goods*, 2016 IL App (1st) 140511

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. THADIEUS GOODS, Defendant-Appellant. |
| District & No. | First District, First Division<br>Docket No. 1-14-0511 |
| Filed<br>Rehearing denied | September 12, 2016<br>October 7, 2016 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 07-CR-15601-03; the Hon. Frank G. Zelezinski, Judge, presiding. |
| Judgment | Reversed and remanded. |
| Counsel on Appeal | Michael J. Pelletier, Alan D. Goldberg, and S. Amanda Ingram, all of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, Christine Cook, and Iris G. Ferosie, Assistant State's Attorneys, of counsel), for the People. |
| Panel | PRESIDING JUSTICE CONNORS delivered the judgment of the court, with opinion.<br>Justices Cunningham and Harris concurred in the judgment and opinion. |

**OPINION**

¶ 1      After a jury trial, defendant, Thadieus Goods, was found guilty of first degree murder (720 ILCS 5/9-1(a)(2) (West 2010)) and of personally discharging a firearm that proximately caused the victim's death. Prior to trial, defendant's attorney asserted compulsion as an affirmative defense, but the court granted the State's motion to bar this defense because compulsion is not available as a defense to first degree murder in Illinois. In mitigation at sentencing, due to a fear for his safety being threatened if he was known to be a "snitch," defendant requested to present *in camera* the testimony of an assistant State's Attorney to whom defendant had provided information while in prison regarding an alleged solicitation of murder of an 11-year-old victim in an unrelated criminal sexual abuse case. The court denied his request and sentenced defendant to 65 years in prison. On appeal, defendant argues that his trial counsel was ineffective for failing to assert self-defense and ask for the corresponding jury instructions, the court failed to properly exercise its discretion in refusing to allow defendant's mitigation witness to testify *in camera*, and his 65-year sentence was excessive. For the following reasons, we reverse the judgment of the trial court and remand for a new trial.

## I. BACKGROUND

¶ 2

¶ 3      Pierre Jordan was found shot to death in the parking lot of an apartment complex located at 3700 174th Court in Lansing on June 30, 2007. Defendant, along with Ronnell Hansbrough, Torrey Hansbrough, and Tina Robinson, was charged with eight counts of first degree murder for Jordan's death.

## A. Pretrial Motions

¶ 4

¶ 5      On July 2, 2007, defendant was arrested by Chicago police on an unrelated misdemeanor offense. He remained in custody until July 4, 2007, when he was brought before a judge for a bond hearing and the misdemeanor charge was dismissed. Immediately after the dismissal, defendant was rearrested by Lansing police in connection with Jordan's murder. While in custody, defendant was interrogated and provided a videotaped statement. Subsequently, defendant was indicted by a grand jury. On July 23, 2009, defendant filed a motion to quash arrest and suppress evidence, arguing that his arrest was made without a valid search or arrest warrant and that his conduct prior to arrest did not give rise to probable cause. Defendant also argued that the statement he gave while in custody should be suppressed due to the lack of probable cause. Defendant filed another motion to suppress the statement on April 21, 2011.[1] The second motion to suppress asserted that prior to interrogation, defendant stated that he knew nothing of Jordan's murder and had nothing to say, but that "due to the physical, physiological, mental, educational, emotional and/or psychological state, capacity and condition of the [d]efendant, he was incapable and unable to appreciate and understand the full meaning of his *Miranda* rights [(*Miranda v. Arizona*, 384 U.S. 436 (1966))] and any statement was therefore not *** made voluntarily, knowingly and intelligently." Defendant also argued

---

[1]It appears from the record that the filing of two motions to suppress was due to the fact that defendant was initially represented by the public defender's office and later by a private attorney. Specifically, the public defender was given leave to withdraw and private counsel was given leave to file his appearance on July 16, 2010, which was in between the filing of the two motions to suppress.

that he had been told that his wife had been arrested and that if he did not cooperate she would be charged with murder, rendering the statement defendant ultimately made a product of coercion. On August 24, 2011, after hearing argument, the court denied defendant's motion to suppress, stating that "the State has met their burden at this juncture." The court further stated that it "[felt] that the defendant was appropriately advised of his rights and waived his rights at the appropriate times" and that "there was no right in any way [defendant] be allowed to speak to anybody, be it [his] mother, girlfriend, or whoever."

¶ 6    On April 21, 2011, defendant also filed a motion to dismiss the indictment, which was later amended on September 8, 2011. The motion to dismiss asserted that an officer gave false testimony to the grand jury, which resulted in the true bill directed against defendant. The court conducted a hearing on the amended motion to dismiss the indictment on October 18, 2011. At the hearing, the defense argued that at the grand jury, an officer falsely testified that the police had learned defendant and the three other defendants had planned to kill Jordan, as there was no evidence of a plan in any of the defendants' statements. Also, the defense pointed to the officer's grand jury testimony that made it seem as though defendant was the sole person involved in the murder because it was not made clear that codefendant Ronnell Hansbrough was the person who shot Jordan first. The court denied defendant's motion to dismiss, finding that there was not a willing falsity or willingness to deceive the grand jury and, thus, not enough to overturn the indictment.

¶ 7                                                    B. Trial

¶ 8    Prior to the commencement of defendant's jury trial, the State filed a motion *in limine* seeking to admit the inculpatory portion of defendant's videotaped statement from July 4 and July 5, 2007, and exclude the other portions of defendant's statement that dealt with how he knew Jordan and mentioned the prior time defendant served in prison. The State's motion *in limine* also sought to preclude defendant from offering any evidence of Jordan's prior bad acts because defense counsel "failed to allege self-defense and/or file a *Lynch* motion." On March 26, 2007, the day before defendant's trial began, the court heard argument on the State's motion *in limine*. Regarding the admission of defendant's videotaped statement, the State asserted that it only intended to introduce the inculpatory portion of defendant's statement and the portion showing defendant received *Miranda* warnings. It would not be showing the portions where defendant talked about how he knew Jordan and their imprisonment together, where defendant denied any involvement in Jordan's murder, or where defendant asked for an attorney. In response, the defense argued that including only the inculpatory portions would be extremely prejudicial to defendant, especially since defendant spent so much time at the beginning of his interrogation denying any involvement. The defense argued that it was not until the police mentioned defendant's girlfriend and her health problems that defendant stated he was involved. The defense conceded that it was amenable to having the portions of the statement that referenced defendant's previous criminal background redacted from the video. The court ruled that it would not allow the jury to hear all of defendant's statement. However, it allowed cross-examination on the issue of what occurred prior to defendant admitting his involvement, how long the interrogation went on, and the fact that defendant initially denied his involvement.

¶ 9    The court next addressed the State's motion *in limine* regarding the use of the victim's prior bad acts. The State asserted that because defense counsel had not alleged self-defense or filed a

*Lynch* motion, any prior bad acts by Jordan should be barred. The defense objected to the State's motion "because we are introducing [an] affirmative defense which may indeed get into prior bad acts which would be why the person felt compelled to do what he did." Defense counsel then confirmed that he was, in fact, alleging the defense of compulsion, not self-defense. The court replied that "[prior bad acts] would not come in for [compulsion] anyway. So that's where we stand. Unless you're alleging self-defense, this is not even an issue. So they're not allowed anyway." Defense counsel then argued that if defendant testified as to why he felt compelled to do what he did, it would be because he knew Jordan had committed prior acts and because of his personal knowledge of Jordan "being in a situation where he has [had] to use a gun in the past." The court ultimately determined that it could not rule on this matter at the time and reserved its rulings for defendant's testimony. The parties then engaged in jury selection.

¶ 10   On the following day, March 27, 2012, prior to opening statements, the State raised the argument that the defense of compulsion was not available to defendant in this case because he was charged with murder. Primarily relying on the cases of *People v. Anderson*, 2011 IL App (1st) 071768, and *People v. Gleckler*, 82 Ill. 2d 145 (1980), the State asserted that "there is 185 years of case law that says that compulsion is not a defense for first degree murder." Defense counsel responded that he was aware of death penalty cases where compulsion was allowed to be asserted and that even though this was not a death penalty case, "it is still a murder case." The court then read directly from section 7-11 of the Criminal Code of 2012 (Code), titled "compulsion," which reads:

> "A person is not guilty of an offense other than an offense, punishable with death, by reason of conduct that he or she performs under compulsion of threat or menace of the imminent infliction of death or great bodily harm, if he or she reasonably believes death or great bodily harm will be inflicted upon him or her, or upon his or her spouse or child, if he or she does not perform that conduct." 720 ILCS 5/7-11(a) (West 2012).

The court further noted that the statute had not been amended to explicitly include first degree murder, rather than "an offense punishable with death," even though Illinois no longer recognized the death penalty, thus, requiring the court to look to case law, which made clear that compulsion was a prohibited defense in a first degree murder case. Recognizing this as "black letter law," the court granted the State's request and barred defendant from asserting compulsion as a defense.

¶ 11   Thereafter, the trial began with the parties presenting their opening statements. In its case-in-chief, the State first called Edward Jordan, the father of the victim, to testify. Edward testified that he saw Jordan on June 29, 2007, the evening prior to the murder, and that Jordan appeared "fine" and "healthy." The State next called Juanita Seals, a woman who lived in the apartment complex where Jordan was killed. Seals testified that on June 30, 2007, at approximately 3 a.m., she was asleep in her bedroom in her apartment at 3700 174th Court in Lansing and was awakened by "popping sounds" that were coming from outside her bedroom in the parking lot. Seals testified she originally thought the sounds were firecrackers but then realized they sounded like gunshots, so she "got up and got down on [her] knees and looked out of [her] window," which looked out on the parking lot. She stated that when she looked out the window, she saw two males standing over another man who was laying flat on his face and that one of the two males who was standing was shooting the man on the ground. Seals testified that she could not see the two men's faces, but she saw that one was heavyset and the other was

shorter than the heavier man. The heavyset man was the one she observed shooting downward at the third man, and she could see fire coming from the gun. Seals also testified that she could "hear the sounds of the bullets coming from the gun, the actual shooting, pow, pow, pow, pow." Seals estimated that she observed four to five shots. Then, she crawled back to her bed and called 911. She testified that while on the phone, she was asked to look back out the window, which she did, and saw the two men were gone. The man who was shot was still laying "flat on his face" in the parking lot. Seals testified that she heard additional shots while she was on the phone with 911 but could not see who was shooting. Seals stated that "anywhere from four to six minutes total" elapsed from the time she first heard the popping sounds until she saw the men were gone. Seals also stated that the area in the parking lot was well-lit enough for her to see that there were two male shooters but not well-lit enough for her to see the actual gun, only the fire coming from it.

¶ 12        The State then called Officer Todd Yonker, the Lansing police officer who was first on the scene, to testify. Officer Yonker testified that on June 30, 2007, at approximately 3:10 a.m., he was alone on patrol when he received a dispatch regarding gunshots and "a man down in the parking lot" at 3700 174th Court. When he arrived at that location, he saw a man lying face down with his hands tucked underneath his body. He believed the man had been shot because he also saw shell casings and a lot of blood. Officer Yonker testified that he did not touch or move the body and did not allow anyone else to touch or move the body until the evidence technician or photographer arrived.

¶ 13        Sergeant Robert Deel of the state police was called next. Sergeant Deel testified that at the time of Jordan's murder, he was working as a crime scene investigator. He arrived at the scene at approximately 7:30 a.m. on June 30, 2007, where he met with Detective Smith of the Lansing police department and conducted a walk-through of the area. He testified that he saw a blue tarp, which he later learned was covering the body of the victim. He took photographs of the scene, including the tarp over the body, as well as the body after the tarp was removed. Sergeant Deel testified that when the tarp was removed, he observed the victim laying face down with his hands underneath his torso in the pockets of his jacket. He also stated that Jordan's vehicle was parked in the parking lot where his body was found and that he recovered 18 cartridge casings and some spent projectiles that were found once the victim's body was rolled over.

¶ 14        The State next called Sergeant John Daley of the Burnham police department to testify on its behalf. Sergeant Daley testified that in July 2007, he was working with the south suburban major crimes task force in the investigation of the shooting death of Jordan. On July 5, 2007, he had a conversation with codefendant Ronnell Hansbrough[2] at the Lansing police station. Through his conversation with Ronnell, Sergeant Daley was directed to a Dumpster behind an apartment building in Calumet City, where he saw a black plastic bag in the corner of the Dumpster that was otherwise empty at the time. Inside the bag was a black Glock semiautomatic handgun and an extended, 30-round clip. He stated that he did not recall the exact number of rounds that were in it, but there were "quite a few." There was also one loose

_____

[2]Sergeant Daley testified that Ronnell Hansbrough went by the name of "Endo." However, in defendant's videotaped statement, he referred to Ronnell and Endo as two different people. Also, in Sergeant Bailey's testimony, which is set forth later in this opinion, he stated that Ronnell and Endo were brothers. For purposes of this opinion, we presume that Ronnell and Endo are not the same person.

round in the bag. An evidence technician from Lansing police department recovered the items, photographed them, and placed the gun into an evidence box separate from the rounds. Next, the State called Officer Dana Tatgenhorst of the Lansing police. Officer Tatgenhorst testified that she was present for Jordan's autopsy on July 1, 2007. She stated the autopsy was performed by Dr. Michelle Jordan. At the autopsy, Officer Tatgenhorst observed Dr. Jordan remove 13 copper bullet jackets from Jordan's body.

¶ 15 On the second day of trial, the State called Jeffrey Parise, a forensic scientist of the Illinois State Police forensic science command who specialized in firearms identification. Upon request of the State and with no objection from the defense, Parise was declared an expert in the field of firearms and firearms identification. Parise testified that he received nine exhibits from the Lansing police department that included the gun recovered from the Dumpster, 18 cartridge cases, and a number of projectiles. Parise stated that he examined a Glock semiautomatic pistol with an extended magazine that held 31 cartridge cases. Parise testified that 5 of the 18 recovered cartridge cases were .45 caliber and were fired by the same firearm but not the Glock semiautomatic pistol that was recovered from the Dumpster. Rather, Parise stated that six of the recovered cartridge cases were, in fact, fired from the recovered Glock and that those cases were 9-millimeter caliber. The remaining seven cases were .380 caliber and were not fired from the recovered Glock semiautomatic pistol. Parise testified that these seven .380-caliber cases were fired from a 9-millimeter Makarov, which is a Russian gun, or possibly a 9-millimeter Luger. Parise stated that there were "at least three guns" used here.

¶ 16 The next witness called by the State was Dr. Ariel Goldschmidt, an employee of the Cook County Medical Examiner's Office. Upon request from the State and with no objection from the defense, the court declared Dr. Goldschmidt an expert in the field of forensic pathology. Dr. Goldschmidt testified that he reviewed the autopsy report of Dr. Jordan, the doctor who actually performed Jordan's autopsy. Dr. Goldschmidt stated that Jordan had multiple gunshot wounds, including, *inter alia*, three to the back of the head, one to the back of the neck, three to the back, one to the shoulder, three to the armpits, two to the left arm, and one to the left chest. There were 13 projectiles recovered from Jordan's body. Dr. Goldschmidt testified that he could not say whether Jordan was deceased before the last gunshot wound was received. However, he testified that there was blood in Jordan's upper chest around his lungs, which meant that although he could have been brain dead, his heart was still pumping after he was shot. Dr. Goldschmidt testified that the cause of Jordan's death was multiple gunshot wounds and the manner of death was homicide.

¶ 17 Sergeant Scott Bailey, a member of the investigation division of the Lansing police department and south suburban major crime task force, was called next by the State. Sergeant Bailey testified that shortly after 3 a.m. on June 30, 2007, he responded to the scene at 3700 174th Court, where he saw a deceased male who had been shot. He testified that pursuant to his investigation, he learned that the names of the people who were involved with Jordan's death were Ronnell Hansbrough, a/k/a "Little Bro," and Torrey Hansbrough. Regarding the physical build of defendant and Ronnell, Sergeant Bailey stated that defendant "is a lot bigger and heavy, thicker," and that Ronnell was "thinner, shorter." He also stated that Ronnell, Endo, and Torrey were all brothers. Sergeant Bailey testified that he and Sergeant Daley spoke with defendant on July 5, 2007, at about 4 p.m. in the Lansing police department criminal investigation interview room. He stated that he had spoken with defendant on two previous

occasions, where defendant had denied any involvement with Jordan's death. He also testified that the second conversation ended when defendant asked for an attorney.

¶ 18   Sergeant Bailey further testified that the conversation with defendant at approximately 4 p.m. began with him "reminding [defendant] of his *Miranda* [w]arnings." Defendant was also made aware that audio and visual recordings of the conversation were being made. Sergeant Bailey testified that Endo, Ronnell, and Torrey were all brothers and that defendant's girlfriend, Tina Robinson, was also known as "Baby Cakes." On cross-examination, Sergeant Bailey agreed with defense counsel that defendant had concerns for Robinson and kept trying to get the police to put them in the same room so he could talk to her. Sergeant Bailey testified that Robinson became so ill while in custody that she had to be taken to the hospital, and the officers made a point of telling that to defendant.

¶ 19   The DVD of defendant's statement from July 5, 2007, was published to the jury. In his statement, defendant stated that Jordan, who defendant knew to be a cocaine dealer, told him that he was "fitting to go in on them," referring to robbing Endo and Ronnell, because they had "balls of money wrapped up *** in plastic." Jordan asked defendant to get him in the apartment complex, but defendant would not because there were cameras on every door and he did not want to be seen with Jordan. Defendant stated that a couple days to a week before Jordan's murder, he told Endo that Jordan "want to run in your momma house, and he not playing," to which Endo replied " 'let him run his a*** in there, we gonna off his a*** in there.' " Sometime thereafter, defendant spoke with Jordan and again told him, "I ain't going nowhere to be in front of no camera." Defendant told the officers he knew that "if I got knowledge of [Jordan] running in they crib, he getting down on me when he get through with them."

¶ 20   The following day Jordan pulled up to the apartment complex with his girlfriend in the front seat, his daughter in the backseat, and a gun on his lap. Jordan asked defendant if he did his "homework," and defendant replied that he had after seeing the gun on Jordan's lap. Defendant stated he was thinking "we gotta get this motherf*** out the way, straight up." After seeing Jordan, defendant called Endo and told him that Jordan was at the building. Defendant stated that Endo said, " 'I'm fitting to shoot the s*** out this n***,' " referring to Jordan. Defendant told the officers that when talking to Endo, he said, " 'My momma live here just like your momma. You know, come on let's—I'm ready to get it over with.' " On Friday, the day before Jordan was killed, defendant was with Robinson over at defendant's mom's apartment. After defendant received a call from Jordan, who said that he was "ready to get it cracking," he then called Endo and told him to give defendant a gun. Endo was not nearby, so he told Ronnell to get defendant a gun, which he did. Defendant stated that Ronnell gave him a "Russian [9-]millimeter."

¶ 21   That night, Jordan picked up defendant, drove around the back of apartment complex, and backed into a parking spot. Defendant stated that at this point, he did not know that Ronnell was already there. Defendant and Jordan both got out of the car, and Jordan went to the trunk and "did something, put on a black jacket." Defendant also said he saw Jordan "fumbling in his waist." Defendant watched Jordan, thinking "you ain't fitting to just pop me and try and run in and they crib because he'll get down like this." Defendant and Jordan walked through the parking lot, then Ronnell "come out of nowhere, boom, hit his a***" and Jordan fell. Defendant stated that Ronnell had "scared the s*** out of me" and when Jordan fell, defendant also fell to the ground. Defendant said he then got up and "[b]oom, boom, boom, I get to giving

it to him." Defendant further stated that Ronnell hit Jordan first, then he shot Jordan, and then Ronnell shot Jordan again with Jordan's own gun.

¶ 22 Defendant told the officers that after the shooting, he ran to the building. Endo, Ronnell, and "B" came to pick him up and Endo said, " 'I love you, bro, man that was love ***. You didn't have to tell us s***. You could have let that n*** come in on me.' " Defendant told Endo that "[w]hen you can't trust somebody you gotta get them out of the way." Defendant said that he feared for his mother's life like Endo feared for his mother's life. Defendant told the officers, "[w]e was fitting to be gone," and "had bus tickets and everything." Defendant and the others then went to a Holiday Inn Express where they cleaned the guns. On Sunday, Endo took the guns in a bag and "took them whenever he wanted to take them." Near the end of his interview, defendant stated that "if any motherf*** go down for this case, it gotta be me, Ronnell and Endo. Cause Endo said kill the motherf***, me and Ronnell run up on the n***. Bottom line."

¶ 23 Thereafter, the State rested its case-in-chief and the defense moved for a directed verdict, which was denied. On the final day of trial, March 29, 2012, the defense rested without presenting any evidence. Prior to deliberation, the court heard argument on jury instructions. The State proposed that the jury should be given an accountability instruction. The defense objected, arguing that the evidence did not show that defendant was responsible for Ronnell's conduct because he did not know that Ronnell was already at the apartment or that he was going to shoot Jordan at that time. According to defense counsel, defendant did not do anything to promote or facilitate this crime. Rather, he merely told Endo that someone may be coming to the apartment complex to rob or kill him. In response, the State asserted that the evidence had shown that defendant worked in conjunction with Ronnell, planning the murder in advance. The State pointed to the defendant's statement where he admitted he asked Endo to give him a gun. The court overruled the defense's objection and allowed the accountability instruction, which stated:

"A person is legally responsible for the conduct of another person when, either before or during the commission of the offense, and with the intent to promote or facilitate the commission of the offense, he knowingly solicits, aids, abets, agrees to aid, or attempts to aid the other person in the planning or commission of the offense." Illinois Pattern Jury Instructions, Criminal, No. 5.03 (4th ed. 2000).

Defendant's counsel did not ask for an instruction regarding self-defense or second degree murder.

¶ 24 Then, the parties presented their closing arguments. In his closing, defense counsel argued that there was no plot to murder Jordan. He also stated that defendant did not have a gun "until he was scared to death and got one" after seeing Jordan in his car with a weapon on his lap. Defense counsel reminded the jury that defendant told Endo: "Look, this guy is crazy. He is coming to rip you off. You better be prepared." The defense argued that when defendant went to the apartment complex on the night of the murder, he was afraid of Jordan. Later in the closing argument, defense counsel again stated that defendant was scared, because he had just seen Ronnell shoot Jordan and then Ronnell looked at him like he was going to kill him. The State objected to this statement, but the court overruled the objection and reminded the jury that this was argument, not evidence. At the conclusion of his closing, defense counsel stated: "The [d]efendant did not act with Ronnell Hansbrough. He acted alone. He acted by himself, and he was in fear of not only the Hansbroughs, he was in fear of the victim."

¶ 25    After just over an hour of deliberation, the jury returned a verdict, finding defendant guilty of first degree murder and guilty of personally discharging a firearm that proximately caused death to another person.

¶ 26                          C. Posttrial Motions and Sentencing

¶ 27    On May 2, 2012, defendant, through counsel, filed a motion for acquittal notwithstanding the verdict or, in the alternative, for a new trial. The motion argued that the totality of the evidence could not lead a reasonable trier of fact to the conclusion that the State proved its case beyond a reasonable doubt; thus, acquittal was proper. On June 29, 2012, defendant, acting *pro se*, filed an amended motion for acquittal notwithstanding the verdict or, in the alternative, for a new trial that was substantially similar to the original motion except that the amended motion raised the additional argument that defendant received ineffective assistance of counsel and that defendant did not understand what was taking place at trial because he had not been given his psychotropic medication. Upon request of the defense, on June 1, 2012, the court ordered that an examination of defendant's fitness for sentencing take place. In a report dated September 20, 2012, Dr. Nishad Nadkarni, a staff psychiatrist, stated that he found defendant fit for sentencing as there was no evidence that defendant suffered from a *bona fide* major mental illness or cognitive impairment that would preclude him from understanding the charge for which he was convicted.

¶ 28    On November 6, 2012, when this matter was before the court for a status hearing, defendant addressed the court and asked that he be allowed to proceed *pro se* because he believed that his private counsel had a conflict due to defendant's assertion of ineffective assistance of counsel in his amended posttrial motion. Also on that date, defendant's counsel requested a contested hearing regarding defendant's fitness for sentencing, which ultimately took place on November 27, 2012. Dr. Nadkarni testified at the hearing, and the court ultimately found defendant fit for sentencing.

¶ 29    On December 7, 2012, defendant's private attorney was granted leave to withdraw as counsel, and the public defender's office was appointed. Through his appointed counsel, defendant filed a motion for a new trial on June 4, 2013, arguing that defendant was deprived of his right to due process and his right not to testify against himself when the court denied his motion to suppress his statement and allowed his statement to be published to the jury. Defendant argued that his statement was not given voluntarily and was the result of prolonged custody at the Lansing police station and the information regarding his girlfriend, Tina Robinson. Defendant also argued that he was denied due process and a fair trial when the court did not allow him to assert the defense of compulsion at trial. Further, defendant asserted that the court erred in denying defendant's motion for a directed verdict because there was no physical evidence or conclusive eyewitness evidence tying defendant to Jordan's murder. Likewise, defendant argued the jury denied him due process through their finding of guilty when the only direct evidence of defendant's involvement was his own statement. Defendant claimed the jury also denied him due process when they returned a verdict of guilty when Dr. Goldschmidt testified that a shot by a large caliber bullet, such as the ones fired from codefendant Hansbrough's gun, would probably cause "brain death," rendering Jordan dead before defendant even shot him.

¶ 30    Defendant, through his appointed public defender, filed an amended motion for a new trial on August 27, 2013, that contained substantially the same arguments as the original motion,

but added the allegation that his trial counsel was ineffective when counsel "strongly advised" defendant against testifying despite the fact that defendant wanted to testify to give his side of the story. Also, defendant argued his counsel was ineffective when he failed to present the defense of self-defense and instead relied on the defense of compulsion, which was not available in a murder prosecution. Further, defendant, through appointed counsel, filed an addendum to his amended motion for new trial on August 30, 2013, that asserted that defendant also received ineffective assistance of counsel when his trial counsel failed to object to the testimony of Dr. Goldschmidt, as he was not the doctor who had performed Jordan's autopsy. Also, the addendum stated that defendant's trial counsel failed to object to the admission of the certified copy of the autopsy into evidence, which contained testimonial hearsay.

¶ 31    Also on August 30, 2013, the court conducted a hearing on defendant's motion for a new trial. Prior to the hearing, at defense counsel's request, the court allowed the amended motion for a new trial and the addendum to the amended motion to be incorporated into the original motion for new trial. At the hearing, defendant's counsel emphasized that reasonable doubt as to defendant's guilt existed where Dr. Goldschmidt testified that a person shot in the head with a large caliber gun would probably be severely incapacitated, if not brain dead. Also, defense counsel argued ineffective assistance by defendant's trial counsel, stressing that counsel was ineffective when he failed to object to Dr. Goldschmidt's testimony because Dr. Goldschmidt was not the medical examiner who performed Jordan's autopsy, which meant defendant was not able to cross-examine the doctor who had, in fact, performed the autopsy, a violation of defendant's rights under the confrontation clause. In response to defendant's motions and addendum, the State argued in part that defendant's trial counsel was not ineffective for failing to assert the theory of self-defense because the facts of this case did not support such a theory. The State asserted that there was no evidence that defendant was afraid of Jordan. Also, the State argued that counsel was not ineffective because "[h]e presented a defense for defendant that was very effective but the evidence bore out that the defendant was in fact guilty." Finally, the State asserted that there was no ineffective assistance for failure to object to Dr. Goldschmidt's testimony where there was a statute that allowed him to testify as to another medical examiner's findings.

¶ 32    In its oral ruling, the court noted that it had presided over the case since its inception and that it relied on its previous, "extensive" rulings on the issue regarding suppression of defendant's statement. Additionally, the court stated that there was identification of defendant's participation evidence other than his statement. Regarding the issue of defendant's theory of defense, the court stated, "[t]he defense initially wanted to consider a compulsion defense however by [s]tatute and case law that was unavailable on a murder case." The court did not mention the issue of ineffective assistance of counsel for failure to assert the theory of self-defense. As to Dr. Goldschmidt's testimony, the court stated that his testimony was not improper and testimony of that kind "has been allowed consistently through case law throughout as well as by [s]tatute." Ultimately, the court denied defendant's motion for a new trial. The court stated that it believed its previous rulings were appropriate and the jury's decision was appropriate and supported by the evidence. Also, the court found the conduct of the attorneys was appropriate, specifically, the court noted that defendant's trial counsel "gave the best representation and defense that he could under the circumstances of what he had."

¶ 33        A presentence investigative (PSI) report was filed with the court on January 27, 2014. The report stated that it was based on a November 15, 2013, interview with defendant, juvenile court records, defendant's adult criminal history, and criminal court records. It also stated that a probation officer spoke via telephone with defendant's mother. The PSI report reflected that the juvenile court records showed numerous charges against defendant, some violent and some nonviolent, beginning at age 12. Similarly, defendant's adult criminal history showed numerous offenses, beginning when defendant was 17 years old. In 1995, he was charged with possession of a stolen motor vehicle, pled guilty, and received two years probation, which was later terminated due to his imprisonment on another offense in 1997. In 1996, defendant was arrested twice: once in June in Chicago for aggravated possession of a stolen motor vehicle, for which he pled guilty and received four years' imprisonment, and once in July in Lee County for possession of a stolen motor vehicle, for which he received five years' imprisonment.[3] In October 2002, approximately five months after he was released from prison, defendant was arrested for felony possession/use of a firearm, a Class 3 offense, pled guilty, and was sentenced to two years' imprisonment. In December 2003, two months after he was released, defendant was arrested for unlawful use of a weapon by a felon, a Class 2 offense, for which he pled guilty and was sentenced to four years' imprisonment.

¶ 34        The PSI report also reflected that defendant had never been married but was in a relationship and lived with codefendant, Tina Robinson, with whom he had two children, ages 14 and 15. Regarding defendant's level of education and employment, the PSI report stated that he attended school through eighth grade and had taken classes from time to time while in prison. Also, defendant worked in 2006 and 2007 by maintaining vehicles for his brother's transportation service. Regarding defendant's physical condition, the PSI report stated that "[h]e was injured in 2012 in the jail when he was beaten and stabbed by a bunch of men, and his nose was broken." The PSI report also stated that defendant told the probation officer that he had been treated since age 14 for bipolar disorder, schizophrenia, and depression. At the time of the PSI interview, defendant was medicated with Seroquel and Wellbutrin. Defendant also told the probation officer that he began smoking marijuana and drinking at the age of 11, and began using cocaine at the age of 13.

¶ 35        Defendant's sentencing hearing took place on February 10, 2014. The court began by stating that it had the PSI report and asked if either side had any additions, deletions, or modifications, which neither did. The State then presented aggravation testimony in the form of a victim impact statement from Brenda Jordan, the victim's mother. Thereafter, the court asked the defense if it had any mitigation witnesses to call. The defense responded that it wished to call Assistant State's Attorney Dan Weiss in mitigation and requested that his testimony be taken *in camera*. The court then asked the attorneys to come to his chambers to address this issue, and the following exchange took place:

> "THE COURT: At this time, we are outside the presence of all parties in a side-[b]ar. Tell me what we're doing.
>
> MR. TYSON [Assistant Public Defender]: Your Honor, my client has worked with Mr. Weiss to provide information regarding there was an inmate in the Cook County Jail who was trying to solicit the murder of an 11-year-old victim in a criminal sexual

_____

[3]It is unclear from the PSI report whether defendant's five-year sentence was as a result of a guilty plea or trial.

abuse case, a predatory criminal sexual abuse case, and my client was helpful to the State's Attorney's [o]ffice with respect to that. He testified at the [g]rand [j]ury, et cetera.

And he's been attacked in the jail and we're concerned about this matter being in open court that the information will get out and further jeopardize his safety while he's still in the custody of the Cook County [s]heriff, so we're asking to do this *in camera* and if the [c]ourt would consider the mitigation presented *in camera* for the purpose of sentencing.

THE COURT: Ms. Morrissey?

MS. MORRISSEY [Assistant State's Attorney]: Judge, as long as Mr. Goods—this is his request and he is not going to bring up some later appellate issue about this, I'm fine so that the State—the information about him being a snitch and possibly information regarding the investigation regarding this other case does not come out in open court, I'm fine with it as long as he's waiving his right to having it heard in open court.

MR. TYSON: Judge, I did ask him about that and he said he's fine with it. So if the [c]ourt wants to inquire as to, you know, if this is his request, that's fine. He said he would prefer it this way as well.

MS. MORRISSEY: And he waives his presence, obviously?

MR. TYSON: Yes.

MS. MORRISSEY: I would just ask that [Y]our Honor confirm that with him, so he doesn't later claim this to be an appellate issue.

THE COURT: I know what you're agreeing upon is fine and well, but I don't know what the appellate court is going to agree on in the future. I'm not favorable to this. We are in an open forum. Unless by statute it allows me to hold such procedures *in camera* regardless of who agrees to it, I will not allow it.

You can rethink what you wish to question or present in mitigation, but anything that goes will be in open court at this stage."

The parties then reconvened in the courtroom and the following exchange occurred:

"THE COURT: Once again, we are in open court with all the parties present in the matter of the People vs. Thadieus Goods.

Again, on behalf of the defense, do you wish to present mitigation testimony?

MR. TYSON: Your Honor, we do have present [a]ssistant State's Attorney Dan Weiss, who was prepared to offer mitigation testimony on behalf of Thadieus Goods, but I think upon further consideration Mr. Goods does not wish to have that witness called in his favor. Is that correct, Mr. Goods?

THE DEFENDANT: Yeah.

MR. TYSON: He does not wish to have Mr. Weiss called at this time.

THE COURT: Is that your decision, Mr. Goods?

THE DEFENDANT: Yeah, that's my decision.

THE COURT: The record is clear. That's his decision."

¶ 36    The defense then stated that there were no other mitigation witnesses to be called. In aggravation, the State argued that defendant's conduct caused serious bodily harm when he

ambushed and executed Jordan. Also, the State emphasized that defendant had a history of criminal activity and has been in the criminal justice system since the age of 12. The State went through defendant's juvenile and adult criminal history and then asked that the court sentence defendant to life in prison.

¶ 37     In mitigation, the defense began by pointing out that the sentencing range for first degree murder is 20 to 60 years' imprisonment plus a 25-year enhancement where the jury found defendant personally discharged a firearm causing Jordan's death. Defense counsel asked that the court sentence defendant to the minimum, which was 45 years' imprisonment to be served at 100%, because the purpose of the sentence is punishment and even if he received the minimum, defendant would have 45 years to think about the reason why he is in prison. Also, the defense stated that a 45-year sentence would adequately deter others from engaging in this conduct, protect society, and provide enough time for defendant, who would be in his seventies when released, to rehabilitate. The defense went on to explain that the facts of this case showed that there was a possibility of a robbery being committed by Jordan, who was armed, and that sometimes people get killed in violent situations such as this. The defense concluded by asking for the court to strongly consider a range of 45 to 50 years, if the court was not inclined to impose the minimum sentence.

¶ 38     Defendant spoke in allocution. He apologized to the Jordan family and asked forgiveness. Defendant stated that he has had years to reflect on his entire life, stating, "I've learned my lesson and I will forever live a righteous, law abiding life." He concluded by apologizing to his brother and family for putting them though this situation and begged the court to show him mercy.

¶ 39     In delivering its sentencing decision, the court explained that it reviewed all matters in aggravation and mitigation. The court referred to defendant's criminal background as "extreme," stating that there "appears to be about five prior adult felony convictions that just seem to be happening over and over again. There's an extensive juvenile background as well." The court also stated that the killing here "was very heinous in nature, with the victim laying on the ground, being in a helpless form, being riddled by bullets by the defendant, as an independent witness who observed indicated, and that certainly is an aggravating factor to the nature of what occurred here." The court considered defendant's statement of remorse as mitigating but noted that based on defendant's track record, it did not believe defendant could be rehabilitated. Ultimately, the court sentenced defendant to 65 years' imprisonment, with 3 years' mandatory supervised release. Defense counsel then filed a motion to reconsider sentence *instanter*, which the court denied, finding there was "extensive aggravation to warrant the sentence." That same day, defendant filed his notice of appeal.

¶ 40                                        II. ANALYSIS

¶ 41     On appeal, defendant argues (1) he received ineffective assistance of counsel where his attorney mistakenly believed that he was "not allowed" to present a self-defense theory to the jury and thus never requested that the jury be instructed on self-defense or second degree murder, (2) the trial court erred when it refused to hear Assistant State's Attorney Weiss's testimony *in camera* because it deprived defendant of a fair sentencing hearing, and (3) defendant's 65-year sentence is excessive where the trial court attributed unreasonable weight to defendant's juvenile history and mischaracterized his adult criminal history as "extreme." We agree with defendant that he was denied ineffective assistance of counsel. We also address

defendant's arguments regarding his sentencing hearing because if defendant is convicted after retrial, the same issues may arise.

¶ 42                                    A. Ineffective Assistance of Counsel

¶ 43        The right to counsel guaranteed by both the United States and Illinois Constitutions includes the right to effective assistance of counsel. U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I, § 8; *Strickland v. Washington*, 466 U.S. 668 (1984). Whether a defendant was denied effective assistance of counsel is evaluated according to the two-prong test set forth in *Strickland v. Washington*, which requires that a defendant show both that the representation provided at trial was deficient and that such deficiency prejudiced the defendant. *Id.* at 687-88.

¶ 44        On appeal, defendant argues that his trial counsel was deficient because although the trial court only barred the defense of compulsion, his trial counsel apparently and mistakenly believed that this meant he was also barred from asserting the defense of self-defense. Defendant further contends that although perhaps unreasonable, a belief in self-defense was consistent with the defense's trial strategy and his counsel's failure to request such a jury instruction was objectively unreasonable and prejudicial. The State responds that trial counsel's decision not to ask for self-defense and accompanying second degree murder instructions was a reasonable strategy because no evidence existed to support a self-defense theory where the evidence showed that Jordan was already face down on the ground with his hands in his pockets when defendant began shooting him. The State also argues that a self-defense instruction would have contradicted the strategy presented by the defense.

¶ 45        In order to satisfy the first prong under *Strickland*, defendant must overcome a strong presumption that, under the circumstances, the challenged action or inaction of counsel was a valid trial strategy. *People v. Bloomingburg*, 346 Ill. App. 3d 308, 317 (2004). "The reasonableness of counsel's actions must be evaluated from counsel's perspective at the time of the alleged error, and without hindsight, in light of the totality of the circumstances, and not just on the basis of isolated acts." *People v. Nowicki*, 385 Ill. App. 3d 53, 82 (2008). It is important to note that effective assistance refers to competent representation, not perfect representation. *Id.* Further, "mistakes in trial strategy or judgment will not, of themselves, render the representation incompetent." *Id.*

¶ 46        To meet his burden for the second prong under *Strickland*, defendant must show that the probability that counsel's errors changed the outcome of the case is "sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. In order to satisfy the prejudice prong, defendant need not show that he would have been acquitted, only that a different outcome would be reasonable, as prejudice may be found "even when the chance that minimally competent counsel would have won acquittal is 'significantly less than 50 percent' as long as a verdict of not guilty would be reasonable." *People v. McCarter*, 385 Ill. App. 3d 919, 935 (2008) (quoting *Miller v. Anderson*, 255 F.3d 455, 459 (7th Cir. 2001)).

¶ 47        We must first decide if a self-defense theory was justified in this case. " 'A defendant in a criminal case is entitled to have the jury instructed on any legally recognized defense theory which has some foundation in the evidence, however tenuous.' " *People v. Lewis*, 2015 IL App (1st) 122411, ¶ 56 (quoting *People v. Looney*, 46 Ill. App. 3d 404, 410 (1977)). A defendant is entitled to an instruction on self-defense if very slight or some evidence exists to support the theory of self-defense. *Id.* " 'In order to instruct the jury on self-defense, the defendant must establish some evidence of *each* of the following elements: (1) force is threatened against a

- 14 -

person; (2) the person threatened is not the aggressor; (3) the danger of harm was imminent; (4) the threatened force was unlawful; (5) he actually and subjectively believed a danger existed which required the use of the force applied; and (6) his beliefs were objectively reasonable.' " (Emphasis in original.) *Id.* (quoting *People v. Jeffries*, 164 Ill. 2d 104, 127-28 (1995)). The Illinois Supreme Court has made clear that "when the evidence supports the giving of a jury instruction on self-defense, an instruction on second degree murder must be given as a mandatory counterpart." *People v. Washington*, 2012 IL 110283, ¶ 56.

¶ 48    At trial, the State presented as evidence the defendant's statement via a videotaped interview that took place at the Lansing police department on July 4 and July 5, 2007. During that statement, defendant said that Jordan had approached him and asked him to go with him to the apartment complex where defendant's and Endo's mothers lived so that Jordan could rob Endo and Ronnell, whom he knew had "balls of money wrapped up *** in plastic." Defendant told the officers that he knew that "if I got knowledge of [Jordan] running in they crib, he getting down on me when he get through with them." Defendant also told the officers that the following day, Jordan pulled up to the apartment complex with his girlfriend in the front seat and his daughter in the backseat to ask defendant if he had done his "homework." At the time Jordan pulled up, he had a "big a***" gun on his lap, which was revealed to defendant when Jordan lifted his shirt. On the night of the murder, defendant stated that when he and Jordan got to the apartment complex, he saw Jordan "fumbling in his waist" and was thinking that Jordan may just "pop" him, then try to commit the robbery. Then, "Ronnell come out of nowhere, boom, hit his a***" and Jordan fell. At this point, defendant stated he also fell to the ground. Then he got up and started shooting Jordan. After that, Ronnell shot Jordan again with Jordan's own gun. At another point in his statement, defendant stated that he feared for his mother's life.

¶ 49    In his closing, defense counsel argued that there was no plot to kill Jordan as the State suggested. In fact, he stated that defendant did not even know Ronnell was hiding in the bushes when he arrived at the apartment complex with Jordan. Defendant's counsel further stated that defendant "didn't have a gun at all until he was scared to death and got one, and he got that because *** [Jordan] was sitting in his car with a .40 caliber weapon in his lap. At that point, defendant knew that he had to go out there because he was afraid for his life, from the victim in this case, startled." Later in his closing, defendant's counsel again stated, "[Jordan] gets out a long jacket, and he gets out a gun that has thirty-one possible bullets in it. The defendant is afraid of this individual." Defendant's counsel also argued that defendant was scared after seeing Ronnell shoot Jordan and that Ronnell looked at him like he was going to kill him. The State objected to this statement and the court overruled the objection. Finally, near the end of his closing, defendant's counsel again asserted that defendant "was in fear not only of the Hansbroughs, he was in fear of the victim."

¶ 50    Defendant has shown that he established some evidence of each of the factors mentioned above. Looking at defendant's statement and the arguments made in his counsel's closing, it is clear that defendant's feeling of "fear" was recurrent throughout the trial. According to his own statement, defendant believed he was in danger. He also believed his mother was possibly in danger. We emphasize that in order for a defendant to earn a self-defense instruction, he or she need only show that very slight or some evidence supports that theory. See *Lewis*, 2015 IL App (1st) 122411, ¶ 56. Here, we believe that defendant has shown that force was threatened against him when Jordan came to see defendant with a gun on his lap, asking if defendant had done his "homework," because Jordan's actions amounted to a threat or at least could have

reasonably been interpreted as one. Additionally, by showing defendant the gun, Jordan became the initial aggressor. On the night Jordan was killed, he had a gun with him again. Although defendant did not see the gun, he saw defendant "fumbling in his waistband" and knew Jordan was at the apartment complex in order to commit a robbery. Also, after defendant shot Jordan, Ronnell shot Jordan with his own gun, showing that Jordan was, in fact, armed and the danger of harm to defendant was imminent.

¶ 51  Whether the aforementioned interpretations and beliefs by defendant are reasonable or unreasonable is of no consequence to the trial court's evaluation, thus we need not address that issue here, as it is the role of the trier of fact, not the trial judge, to weigh the evidence and decide whether that belief was reasonable or unreasonable. *Washington*, 2012 IL 110283, ¶ 43 (citing *People v. Lockett*, 82 Ill. 2d 546, 553 (1980)). For example, in *Washington*, the defendant testified he saw the victim pull a gun, however, no weapon was found at the scene. *Id.* ¶ 42. Thus, the court stated that, "the trier of fact in this case, if instructed properly, could determine from the evidence that defendant was mistaken and that his belief in the need for self-defense was unreasonable." *Id.* Here, although the jury may ultimately determine that defendant's beliefs were unreasonable, we do not consider such a possibility when making our decision.

¶ 52  We find *People v. Serrano*, 286 Ill. App. 3d 485 (1997), to be helpful to our analysis. In *Serrano*, the defendant argued he was denied effective assistance of counsel where compulsion was his theory of defense, but his counsel never asked for an instruction regarding the defense of compulsion. *Id.* at 490. The defendant did not dispute that he was present for the armed robbery at issue; rather, both he and his accomplice testified that he was forced to perform the criminal acts at gunpoint. *Id.* at 492. The defendant also stated that he did not inform the police afterwards because he was told that he and his family would be harmed if he did. *Id.* The court found that he was denied effective assistance because "it cannot be said that the jury, not having been instructed on the defense of compulsion, knew that the defendant's testimony concerning his fears of immediate harm and being forced by the other two men to do the armed robbery could provide a defense to the acts." *Id.* The court opined that where counsel sets forth a defense, he should have requested an instruction on the same and failure to do so "cannot be called trial strategy and is evidence of ineffective assistance of counsel." *Id.* (citing *People v. Lewis*, 240 Ill. App. 3d 463, 467 (1992)).

¶ 53  Defendant argues that *Serrano* supports his position because it acknowledges that where trial counsel failed to ask for an instruction that was supported by the evidence and argued in closing, it amounted to ineffective assistance. In its response, the State fails to address this case. Rather, the State argues that the evidence did not support a self-defense instruction, and even if it did, the theory of self-defense or second degree murder would directly contradict the defense's strategy presented at trial. We find that in this case, like *Serrano*, there was evidence, albeit slight, that warranted a jury instruction that was not given.

¶ 54  Defendant's counsel initially attempted to assert compulsion as an affirmative defense but was not allowed to, as such a defense has not been available in a murder case in Illinois for quite some time (see *People v. Gleckler*, 82 Ill. 2d 145, 156 (1980)), which we believe is further evidence of his deficient performance. Only after the court denied trial counsel's request to assert compulsion did he present the theory that Jordan was already dead at the time defendant shot him. However, as defendant points out in his brief, the assertion that Jordan was

already dead is of no help in a case in which the jury was to be given an accountability instruction. Further, the motion for a new trial filed by defendant's trial counsel states:

"That with all due respect the [c]ourt erred in allowing the [j]ury to be instructed with the accountability instruction when [defendant] was totally unaware that the co-defendant was going to kill the victim. Additionally, since the [c]ourt allowed the defendant to be responsible for the co-defendant's actions he should have also been cloaked with the co-defendant's defense of self-defense which he was not allowed thus depriving him of his due process."

The language used by defendant's counsel is significant. He wrote in the motion that defendant was *not allowed* the use of the defense of self-defense, which is simply not accurate. Rather, defendant's counsel could have asserted self-defense as an affirmative defense or asked for a jury instruction regarding the same. He did neither. Instead, he set forth the defense that Jordan was already dead, which is not objectively reasonable when the jury was to be given an instruction regarding accountability. It also is not consistent with the original defense of compulsion. In his statement, defendant said numerous times that he was afraid for his safety and for the safety of his and Ronnell's mothers, both of whom lived in the apartment complex. Further, in his closing argument, defendant's counsel mentioned that defendant was scared at least four times, specifically stating that defendant only got the gun he used to shoot Jordan after Jordan visited defendant with a gun in his lap. After a review of the evidence presented at trial and the applicable law, we believe that defendant has sufficiently shown that his trial counsel's failure to ask for a self-defense instruction fell below an objective standard of reasonableness and amounted to deficient representation.

¶ 55        Next, we find that defendant has sufficiently shown that he did, in fact, suffer prejudice due to his trial counsel's deficiency, satisfying the second prong of *Strickland*, which requires that a defendant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* Defendant asserts that he was prejudiced by trial counsel's misunderstanding of the applicable law. The State responds that defendant's argument is based on "utter speculation" and cannot support a *Strickland* claim. The State also argues that even if a self-defense instruction would have been given, no reasonable jury would have exonerated defendant or found him guilty of the lesser included offense of second degree murder. We disagree.

¶ 56        Additionally, defendant argues that the conviction and sentence of his codefendant is relevant in determining whether he suffered prejudice. A court may take judicial notice of information that the Illinois Department of Corrections provides on its website. *People v. Young*, 355 Ill. App. 3d 317, 321 (2005). In defendant's brief, he provides a citation to the IDOC website, which shows that his codefendant, Ronnell, was convicted of second degree murder approximately 1 year prior to defendant's trial and received a sentence of 15 years' imprisonment; thus, we recognize and take judicial notice of this fact. That Ronnell was convicted of second degree murder necessarily implies that the jury received an instruction as to the same. It also provides evidence that a "reasonable probability" exists that defendant may have benefitted from a self-defense and second degree murder instruction because, based on the totality of the evidence, the outcome is undermined by the fact that we cannot definitively know what the jury would have decided if presented with a self-defense instruction.

¶ 57    Where a defendant shows that his counsel argues a theory of the case, such as an affirmative defense, but then fails to ensure that the jury is properly instructed on that theory, his counsel's failure cannot be deemed trial strategy and defendant has satisfied the first prong under *Strickland*. See *People v. Gonzalez*, 385 Ill. App. 3d 15, 21 (2008). Additionally, defendant has satisfied the second prong of *Strickland* because he has shown that his trial counsel's deficiency resulted in prejudice. Therefore, based on the foregoing, we find defendant was denied effective assistance of counsel; thus his conviction must be reversed and a new trial ordered.

¶ 58                    B. Denial of a Fair Sentencing Hearing

¶ 59    Although we need not address defendant's second argument on appeal, as we have reversed his conviction and thus also his sentence, we choose to address it because if defendant is convicted after retrial, this sentencing hearing issue may reoccur. See *People v. Richee*, 355 Ill. App. 3d 43, 61 (2005) (recognizing that although it need not address the defendant's remaining claims after finding the trial court committed reversible error, the appellate court opted to address an issue anyway as it was "likely to reoccur on retrial"). Thus, we feel it necessary to address defendant's claim that he was denied a fair sentencing hearing.

¶ 60    Defendant argues that he was denied a fair sentencing hearing where the trial court denied his request to present his mitigating evidence *in camera*. Assistant State's Attorney Dan Weiss was present in court on the date of defendant's sentencing hearing in order to testify on behalf of defendant, who had previously testified before a grand jury and provided information in order to assist the State in an unrelated case involving the alleged solicitation for the murder of an 11-year-old victim of criminal sexual abuse. The State does not dispute that defendant provided valuable information. Prior to sentencing, defendant had been beaten up and stabbed while in jail and feared for his safety if he were to be labeled a "snitch" as a result of Weiss's testimony in open court. His counsel requested that the mitigation portion of the sentencing hearing be held *in camera* to prevent possible harm to defendant. The State did not object but merely requested that defendant's counsel confirm that defendant waived his right to be present at that portion of the hearing, which he did on behalf of defendant. The State also requested that the court confirm with defendant that he waived his right in order to avoid any future appellate issues, which his counsel said he would. The court nonetheless denied defendant's request.

¶ 61    The sixth amendment of the United States Constitution guarantees a public trial "as a safeguard against any attempt to employ the courts as instruments of persecution," and acts as "an effective restraint on possible abuse of judicial power." *In re Oliver*, 333 U.S. 257, 270 (1948); U.S. Const., amend. VI. "The central aim of a criminal proceeding must be to try the accused fairly, and '[o]ur cases have uniformly recognized the public-trial guarantee as one created for the benefit of the defendant.' " *Waller v. Georgia*, 467 U.S. 39, 46 (1984) (quoting *Gannett Co. v. DePasquale*, 443 U.S. 368, 380 (1979)). " 'The presumption of openness may be overcome only by an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest. The interest is to be articulated along with findings specific enough that a reviewing court can determine whether the closure order was properly entered.' " *Id.* at 45 (quoting *Press-Enterprise Co. v. Superior Court*, 464 U.S. 501, 510 (1984)).

¶ 62    Here, in denying defendant's request for *in camera* proceedings, the trial court stated:

"I know what you're agreeing upon is fine and well, but I don't know what the appellate court is going to agree on in the future. I'm not favorable to this. We are in an open forum. Unless by statute it allows me to hold such procedures *in camera* regardless of who agrees to it, I will not allow it.

You can rethink what you wish to question or present in mitigation, but anything that goes will be in open court at this stage."

We find the trial court's assertion that it would not hold proceedings *in camera* unless presented with *statutory* authority allowing it to do so to be problematic.

¶ 63    We recognize that Illinois does not have a statute that sets forth the framework that courts are to use in determining if *in camera* proceedings are warranted. We believe that a statute or rule that expressly allows a party or victim to present evidence *in camera* during sentencing when good cause is shown may help avoid allegedly unfair sentencing hearings, like the one presented in this case. Currently, section 5-4-1 of the Unified Code of Corrections, the Illinois statute regarding sentencing, merely states that "a hearing shall be held to impose the sentence," and at the hearing, the court shall "consider evidence and information offered by the parties in aggravation and mitigation." 730 ILCS 5/5-4-1(a), (a)(4) (West 2014). The statute is silent regarding a request from any party regarding *in camera* proceedings. We rely on a "good cause" standard based on subsection (i)(4)(C) of Rule 32 of the Federal Rules of Criminal Procedure, which reads:

"(C) In Camera Proceedings. Upon a party's motion and for good cause, the court may hear in camera any statement made under Rule 32(i)(4)."[4] Fed. R. Crim. P. 32(i)(4)(C).

¶ 64    Because we have not found an Illinois case in which a defendant sought to present mitigation evidence *in camera*, we look to federal case law for support. In *United States v. Biagon*, 510 F.3d 844, 846 (9th Cir. 2007), the Ninth Circuit Court of Appeals addressed the issue of whether the district court violated the defendant's right of allocution when it denied a motion to close the courtroom. At the beginning of the defendant's sentencing hearing, his attorney made a general, oral motion to close the courtroom, which the court denied. *Id.* at 846-47. The defendant wanted the courtroom closed due to his cooperation with the government, in which he offered "valuable information against his co-defendants and about the conspiracy in general." *Id.* at 846. However, neither defense counsel nor the court ever stated in open court during sentencing that the defendant had cooperated and provided information to the government. *Id.* at 847. In fact, the court went so far as to call the issue the "sort of elephant in the room" that "we're not going to discuss." (Internal quotation marks omitted.) *Id.* The defendant provided a statement in allocution wherein he sought forgiveness from the court. *Id.*

¶ 65    On appeal, the Ninth Circuit determined that the district court did not violate the defendant's right of allocution. *Id.* The court pointed to Rule 32, which allows a statement to be made *in camera* for good cause shown. *Id.* at 848 (quoting Fed. R. Crim. P. 32(i)(4)(C)). The court stated that the defense did not make a motion pursuant to Rule 32 but merely made a

---

[4]Rule 32(i)(4) references a party or victim's "opportunity to speak" at sentencing. "Opportunity to speak" includes the requirement that, *inter alia*, "[b]efore imposing sentence, the court must *** address the defendant personally in order to permit the defendant to speak or present any information to mitigate the sentence." Fed. R. Crim. P. 32(i)(4)(A)(ii).

general, oral request for closure of the courtroom at the beginning of the sentencing hearing without prior notice to the public, which is required before a court may close proceedings to which a qualified right of access exists. *Id.* This failure to follow proper procedures was fatal to the defense's request. *Id.* However, in his concurrence, Judge Kleinfeld disagreed with this reasoning by the majority. *Id.* at 849 (Kleinfeld, J., concurring). Judge Kleinfeld stated that there was no requirement that a written motion be filed and the defense's oral motion should have invoked the court's discretion under Rule 32. *Id.* Further, he wrote that, at times, there is a "good reason" for holding sentencing hearings, at least partially, *in camera*. *Id.* at 850. Specifically, Judge Kleinfeld recognized:

> "The most common reason for *in camera* proceedings during sentencing arises when a defendant has cooperated with the government. The purpose is to protect him or her from being murdered by individuals not sharing the defendant's interest, or fellow prisoners who find out that he was a 'snitch.' Many criminals have strong feelings about people they call 'snitches,' even where their own cases were not affected. It is one thing to send a defendant to jail or prison and quite another to set him up to be hurt or killed there." *Id.*

¶ 66　　The case before us is nearly identical to the situation Judge Kleinfeld discussed in his concurrence in *Biagon*. Defendant cooperated with the State in an unrelated case involving solicitation of the murder of an 11-year-old criminal sexual abuse victim. Defendant provided valuable information and testified before the grand jury. Assistant State's Attorney Weiss was in court on the date of defendant's sentencing hearing and ready to testify in mitigation on defendant's behalf. Defendant had previously been beaten and stabbed in prison and feared for his safety should it become known that he acted as a "snitch" in the unrelated case. As Judge Kleinfeld noted, "[m]any criminals have strong feelings about people they call 'snitches.' " Defendant's attorney presented the trial court with this reasoning for his request to proceed with mitigation *in camera*. However, the court, without any consideration of defendant's interest in proceeding *in camera*, denied his request because there was no statutory authority for proceeding in that manner.

¶ 67　　We believe defendant's concerns for his safety amounted to good cause. We also believe that creating a mechanism that would protect the safety of defendants who cooperate with the government may encourage defendants to provide the State with information they acquire while in jail or prison. This could ultimately help prevent violence or death to innocent victims, as was allegedly prevented here. We recognize that the court below did not deny defendant the opportunity to present mitigating evidence, it merely denied him the opportunity to do it *in camera*. However, defendant had previously been injured by other inmates in the jail; thus, the court was essentially asking defendant to choose between his safety and presenting mitigating evidence, which we do not believe permits a fair hearing, especially where defendant did not have any other mitigating evidence to present. As Judge Kleinfeld recognized, "[i]t is one thing to send a defendant to jail or prison and quite another to set him up to be hurt or killed there." Given the dearth of case law in Illinois on this issue, and the fact that this issue may arise again after defendant's retrial if he is convicted, we found it imperative to address defendant's second argument on appeal.

## C. Excessive Sentence

Based on our determinations in subsection I of this opinion, we need not address defendant's claims of an excessive sentence, as defendant is to receive a new trial that necessarily also reverses his sentence of 65 years' imprisonment.

## III. CONCLUSION

Based on the foregoing, we reverse and remand this matter for a new trial.

Reversed and remanded.